Samuel **GRAFTON** and Lyle **Silversmith,** Individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

**BROOKLYN LAW SCHOOL et al.,** Defendants-Appellees.

No. 799, Docket 73–1098.

United States Court of Appeals, Second Circuit.

Argued May 2, 1973.

Decided May 24, 1973.

Eric M. Lieberman, New York City (Victor Rabinowitz, Dorian Bowman, and Rabinowitz, Boudin & Standard, New York City, [for National Emergency Civil Liberties Committee], of counsel), for plaintiffs-appellants.

Denis McInerney, New York City (Henry G. Bisgaier, Frank W. Krough, and Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, of counsel), for defendants-appellees.

Before FRIENDLY, Chief Judge, HAYS, Circuit Judge, and JAMESON,* District Judge.

FRIENDLY, Chief Judge:

This appeal is from an order of the District Court for the Eastern District of New York dismissing for want of jurisdiction a civil rights suit brought by two students expelled from Brooklyn Law School, a private non-profit institution, for scholastic deficiency, on the ground that the Law School was not engaged in state action. It raises, as did Powe v. Miles, 407 F.2d 73 (2 Cir. 1968) and Coleman v. Wagner College, 429 F. 2d 1120 (2 Cir. 1970), the question whether various involvements of the State and City of New York with the

* Of the District Court for the District of Montana, sitting by designation.

Law School have converted what on its face was private action into action "under color of any State law, statute, ordinance, regulation, custom, or usage" within 42 U.S.C. § 1983.[1] The frequency with which such questions now arise has not made the task of giving a principled answer any easier.

Brooklyn Law School, originally a division of St. Lawrence University, became a wholly independent school in 1941. It operates under a charter granted by the New York State Board of Regents.[2] It has adopted policies and practices entitling it to be considered an "approved law school" within former Part 523 of the Rules of the New York Court of Appeals relating to the Admission of Attorneys and Counselors at Law[3] so that, under former § 521.1, now § 520.4(a), a graduate is eligible to take the state bar examination without having studied for four years in a law office.

Plaintiffs' claims, as stated in the complaint and their affidavits in reply to defendant's motion for summary judgment,[4] are as follows:

Plaintiff Grafton commenced his studies at Brooklyn Law School in the fall of 1969 and achieved a good grade average during his first semester. He became a staff member of *The Justinian*, the school newspaper, and wrote an article exposing underrepresentation of blacks in the student body. In the spring of 1970 he vigorously participated in anti-war activities in regard to the conduct of the war in Southeast Asia. The Law School granted a request voiced by many students that, in order to permit participation in such activities, the examinations that would normally have been given in the spring of 1970 be postponed for those who so requested until September. For this semester Grafton, who made such a request, received a D+ average which included 6 points of F out of a total of 13, and was given a "final personal warning" by the Assistant Dean. Grafton claims that grades on the September examinations were generally lower than those in June and that this was due to retaliation by the faculty against anti-war activities.

In the fall of 1970 Grafton was elected editor-in-chief of *The Justinian*. During his tenure it published several controversial articles including a reprint of a scathing column in the *New York Post* relating to the work habits of state

1. Although the complaint asserted other bases of jurisdiction, it is apparent that all hinge on the case's coming within 42 U.S.C. § 1983 and its jurisdictional implementation, 28 U.S.C. § 1343(3). Plaintiffs have not contended otherwise on this appeal.

2. The Board, created in 1784, is officially, and confusingly, known as the University of the State of New York, Education Law § 201. As that term is used in ordinary speech, this is precisely what the Board of Regents is not. As stated in an introductory note to the official compilation of the Education Law, Graves, Development of the Education Law in New York, p. xiii, "The term 'university' was not used to denote a university in the present day sense, but simply a corporation authorized to charter and control institutions of higher and of secondary education established in the state." Public instruction began eleven years later, Laws 1795, c. 75. New York was rather late in entering the field of public higher education. For many years this was only on a specialized basis. The State University of New York, including certain existing state institutions and others that might be established or acquired, was created by Laws 1948, c. 695. Admittedly Brooklyn Law School is not a part of the State University.

3. Former Parts 521 through 529 of the Rules of the New York Court of Appeals were deleted effective September 1, 1972. They reappear in substantially similar form in current Part 520.

4. Together with their answer to the complaint, defendants moved for dismissal for lack of jurisdiction or, in the alternative, for summary judgment. The supporting papers challenged plaintiffs' essential factual claims, and defendants urge that if we should disagree with the district court's holding of lack of state action, we should direct that summary judgment be granted in their favor. In view of our disposition of the appeal, we do not reach this request.

judges and the results of a poll indicating the opinion of a large majority of the students that the new dean should not be selected from the administration or faculty. For the fall semester of 1970–71 Grafton received another D+ average; this included an F in a 3-credit course in taxation. Grafton claims that the taxation final examination was so contrived that the grading professor could pass or fail any student as he desired, and that staff members of *The Justinian* received lower grades than others taking the same course.[5] Grafton was dropped as a student on February 24, 1971, for the stated reason of failure to maintain the minimum required scholastic average.

Plaintiff Silversmith began his studies at Brooklyn Law School in September 1967, was dropped after the first year for deficient scholarship, but on the basis of an assertion that his attention span had been improved by psychotherapy was readmitted in the fall of 1969 on condition that he maintain a C average. He also became a member of *The Justinian* staff and an anti-war activist. In his first year, in courses he was taking for the second time, he more than achieved the required C average. In the fall semester of 1970–71, taking new courses, he fell far below this, with 3 credits of F, 4 of D, and 2 of C, and was dropped. He asserts this was in retaliation for his anti-war activities.

Applications by both plaintiffs for readmission were denied after hearings. These were stenographically recorded but after their dismissals plaintiffs were refused access to their examination papers.

██ Plaintiffs assert that the Law School's conduct violated their constitutional rights to free speech and representation by counsel, guaranteed by the First and Sixth Amendments as made applicable to the states by the Fourteenth, and deprived them of liberty and property without due process of law in violation of the Fourteenth Amendment. There is no need for us to consider the merits of these claims since we hold, as did the district judge, that the actions of the Law School in dismissing and refusing to reinstate the plaintiffs were not "under color of any State Law, statute, ordinance, regulation, custom or usage," 42 U.S.C. § 1983.

Many of plaintiffs' contentions run counter to the portion of our opinion in Powe v. Miles, *supra*, 407 F.2d 79–82, dealing with the liberal arts students at Alfred University. We there rejected the claim that the furnishing of higher education necessarily constitutes state action because it is a "public function" as that term has developed from Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), and related cases. We see nothing in doctrinal developments since 1968[6] or in the facts here to call for a different result on that score. The circumstance that we are here dealing with a law school rather than a liberal arts college does not make law teaching "governmental in nature." To be sure, law students may become the subject of state action when they apply to the state for admission to the bar, see Schware v. Board of Bar Examiners of New Mexico, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Konigsberg v. State Bar of California, 366 U.S. 36, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); In re Anastaplo, 366 U.S. 82, 81 S.Ct. 978, 6 L.Ed.2d 135 (1961); Law Students Civil Rights Research Council Inc. v. Wadmond, 401 U.S. 154, 91 S.Ct. 720, 27 L. Ed.2d 749 (1971), or after they have achieved admission, see Cohen v. Hurley,

---

5. For reasons stated in the affidavit of the Assistant Dean, the Law School chooses not to maintain anonymity with respect to grading of examinations.

6. If anything, these point in the opposite direction. See Lloyd Corp. v. Tanner,

407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972), which sharply qualified Amalgamated Food Employees Union Local v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), discussed in Powe v. Miles, *supra*, 407 F. 2d at 80.

366 U.S. 117, 81 S.Ct. 954, 6 L.Ed.2d 156 (1961); Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). But the mere fact that a school is giving instruction the successful completion of which affords one, and the more generally desired, path to the taking of a state bar examination,[7] does not make its functions any more governmental than the imparting of the pre-legal instruction which is also required, Rules of the Court of Appeals § 520.3. See Developments in the Law–Academic Freedom, 81 Harv.L.Rev. 1048, 1060–61 (1968).

In *Powe, supra,* 407 F.2d at 81, we likewise rejected the contention that New York's regulation of educational standards under § 207 and other sections of the Education Law in institutions of higher learning caused their acts, in that case the disciplining of students, to constitute state action. Again we find nothing in doctrinal development [8] or in the special circumstances of this case to call for a different conclusion. The regulations issued by the Commissioner of Education for Schools of Law, § 52.17, are no more detailed than those for liberal arts colleges. The regulations do require a law school in New York to maintain "a minimum qualitative requirement for graduation," § 52.17(h), as well as certain quantitative requirements with respect to the physical plant and the teaching staff. But we do not consider this bland provision, commanding only what would be done voluntarily by any law school worthy of the name,

as implicating the state in the administration of an examination system, as we thought the disciplinary regulations required by § 6450 of the Education Law might have done [9] in Coleman v. Wagner College, *supra,* 429 F.2d at 1120.

While Powe v. Miles, *supra,* 407 F.2d at 81, also took a negative view with respect to the relevance of the financial aid given to the liberal arts college in determining state action, plaintiffs' claims here are somewhat more substantial. The financial aid is of two sorts:

One is that the present building of Brooklyn Law School is on a site acquired from the City of New York at a public sale in 1965 where bidding was restricted to "a non-profit corporation . . . for the construction of educational facilities" and the Law School, as the only bidder, bought the land for the upset price of $750,000, allegedly far below its real value.[10] But the mere grant of property to assist the construction of an educational facility has not been thought sufficient to convert it from a private into a public institution. In the first important case where the Supreme Court considered that issue, although not, of course, directly in the context of "state action," Trustees of Dartmouth College v. Woodward, 4 Wheat. (17 U.S.) 518 (1819), 4 L.Ed. 629, the College had been the beneficiary of lands of "great value" granted by the states of Vermont and New Hampshire, 4 Wheat. at 538. However, this did not interfere with Chief Justice Marshall's concluding that Dartmouth's trustees and profes-

---

7. The other is four years study in a law office or offices. Rules of the Court of Appeals, § 520.5.

8. Here also the tendency has been somewhat contrary to plaintiffs' claim. See Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

9. For the writer of this opinion the appropriate verb is "did." See 427 F.2d at 1126–27.

10. Plaintiffs point also to the adoption in 1966 by the City of § D51–66.10 of the Administrative Code of the City of New

York, and by the New York Legislature of Laws 1966, c. 584, both retroactively validating auction sales restricted to non-profit associations, which, they say, were intended to block a taxpayer's suit, Hama Realty Co. v. City of New York and Brooklyn Law School, 52 Misc.2d 192, 274 N.Y.S.2d 392 (Sup.Ct. New York Co. 1966), aff'd 27 A.D.2d 988, 281 N.Y.S.2d 974 (1st Dept. 1967), seeking to set aside the sale to Brooklyn Law School, and to a 1968 consent by the New York City Board of Estimate to the Law School's selling some 60% of the site for $750,000, the same price it had paid for the whole.

sors were not "public officers, invested with any portion of political power, partaking in any degree in the administration of civil government, and performing duties which flow from the sovereign authority." 4 Wheat. at 634. Although the establishment clause of the First Amendment prohibits many types of governmental assistance which would scarcely suffice to make the receiving agency a state instrumentality under 42 U.S.C. § 1983, see, e. g., Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), construction grants to religious educational institutions for secular purposes have been sustained. Bradfield v. Roberts, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899); Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). We need not decide what the result would be if New York City had not only given the land, see note 10 supra, but constructed the buildings and leased them to the Law School, a situation that would demand consideration of how far Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), applies beyond the area of racial discrimination.[11]

■ The other form of state aid is that under § 6401 of the Education Law, added by Laws 1968, c. 677, a private institution meeting "standards of educational quality applicable to comparable public institutions" is entitled to $400 for each bachelor's or master's degree which it awards, except for degrees earned by students with respect to whom other state aid has been granted to the institution. It could well be that such grants by the state, even though they represent only a small part of the cost of affording three years of legal training, would afford a ground for constitutional complaint if the charge here were an admission policy discriminating against racial or religious groups. See Cooper v. Aaron, 358 U.S. 1, 19, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); Louisiana Education Comm'n v. Poindexter, 393 U.S. 17, 89 S.Ct. 48, 21 L.Ed.2d 16, aff'g 296 F.Supp. 686 (E.D.La.1968).[12] But while a grant or other index of state involvement may be impermissible when it "fosters or encourages" discrimination on the basis of race, the same limited involvement may not rise to the level of "state action" when the action in question is alleged to affront other constitutional rights. We do not regard the $400 payment as sufficient to carry on its back the particular constitutional rights that plaintiffs here advance. See Grossner v. Trustees of Columbia University, 287 F.Supp. 535, 548 (S.D.N.Y. 1968). Moreover, while we held as to the College of Ceramics students in Powe v. Miles, supra, that conduct performed by otherwise "private" institutions on contract with the state to provide education would itself be state action, the mere making of an outright grant amounting to a fraction of the actual cost of conferring a degree does not suffice to make the school the agent of the state.

There remains for consideration the point that plaintiffs press most strongly of all, namely, the regulations of the New York Court of Appeals detailing the kind of law school from which a graduate degree will qualify an applicant to take the state bar examination. Such an applicant must be a graduate of an "approved law school," to wit, one whose programs are registered with and approved by the New York State Education Department or one which is approved by the New York State Education Department or one which is approved by the American Bar Association and is determined by the court to have maintained standards not lower than the

11. See Friendly, The Dartmouth College Case and the Public-Private Penumbra 24–29 (1969); Developments in the Law—Academic Freedom, supra, 81 Harv.L. Rev. at 1061.

12. As the writer has suggested elsewhere, see note 11 supra, at 26, there is a peculiar offensiveness when citizens are required to pay taxes "for purposes whence they or their children are excluded." See also Powe v. Miles, supra, 407 F.2d at 82.

Department's requirements. The regulations specify that, in order to be approved, a law school must require "the successful completion" of not less than 1152 classroom periods of 50 minutes each. In defining "successful completion" the regulations specify that complete credit for a period in which one or more failures shall have occurred "shall not be given until passing grades in the failed subjects have been earned, or substitute courses successfully completed, or unless the failures be compensated by a sufficiently high average . . . under the regulations established by the school of law in which the applicant is registered." Although the regulations do not say in terms that written examinations are to be used in determining passing or failure, the 1970 order and opinion of the Court of Appeals on the application of certain law schools to be relieved of this requirement on the occasion of student revulsion to the invasion of Cambodia, In Matter of Rules of Court of Appeals for Admission of Attorneys and Counselors at Law, 29 N.Y. 2d 653, 324 N.Y.S.2d 949, 274 N.E.2d 440 (1970), leave no doubt these are required, save for the exception recognized by the American Association of Law Schools for cases "where academic credit has been earned by substantial written work, as in moot court, drafting, research, or seminars." Plaintiffs say that if the state requires the passing of written examinations in order for students to be eligible to take the state bar examinations as a result of law school study rather than law office work, the administration of the law school examination system is as much "state action" as the administration of the state bar examinations themselves. And here they point to our holding in Coleman v. Wagner College, *supra*, 429 F.2d 1120, that as a result of the enactment of § 6450 of the Education Law requiring New York colleges to adopt regulations for the maintenance of public order on their campuses and file them with state authorities, actions of the colleges under such regulations might be (or, in the writer's view, were) state action, despite our contrary holding with respect to the discipline of the liberal arts students at Alfred University before § 6450 was enacted.

■ We think the present case is fairly distinguishable from *Coleman*. For one thing, plaintiffs' argument proves too much. The regulations of the Court of Appeals apply to law schools not only in New York but throughout the land. If Brooklyn Law School is acting under color of New York law because it gives written examinations in order to meet the requirements of the Court of Appeals for taking the New York bar examinations, Harvard, Yale, Chicago and Stanford are doing so in equal measure—a state of affairs the officers of these institutions would doubtless find surprising. A further point of distinction is that the Court of Appeals was requiring only what the law schools had been doing for generations and, acting through their own professional organization, had decided they should do. Beyond this, and perhaps most important, Brooklyn Law School's giving of examinations has none of the symbolic character of the disciplinary Rules and Regulations of Wagner College which loudly announced that they had been adopted in accordance with the newly enacted statute. See Developments in the Law—Academic Freedom, *supra*, 81 Harv.L.Rev. at 1058–60. No student could reasonably think that in giving and grading examinations, Brooklyn Law School was acting as an arm of New York State. While legitimate public belief is scarcely enough to determine that the acts of an avowedly private institution are state action, it is a factor to be weighed in the scales—as was the existence of the deputy sheriff's badge in Griffin v. Maryland, 378 U.S. 130, 135, 84 S.Ct. 1770, 12 L.Ed.2d 754 (1964).

The judgment dismissing the complaint for lack of federal jurisdiction is affirmed.