**Selene WEISE, Appellant,**

v.

**SYRACUSE UNIVERSITY et al., Appellees.**

**Jo Davis MORTENSON, Appellant,**

v.

**SYRACUSE UNIVERSITY et al., Appellees.**

**Nos. 372, 383, Dockets 74–1977, 74–2092.**

United States Court of Appeals, Second Circuit.

Argued Jan. 6, 1975.

Decided July 14, 1975.

**400**

James I. Meyerson, New York City, for appellants Weise and Mortenson.

David N. Sexton, Syracuse, N. Y. (Bond, Schoeneck & King, William F. Fitzpatrick, Syracuse, N. Y., of counsel), for appellees Syracuse University, and others.

Elsa Dik Glass, Atty., EEOC (William A. Carey, Gen. Counsel, Joseph T. Eddins, Assoc. Gen. Counsel, Beatrice Rosenberg and Charles L. Reischel, Attys., EEOC, Washington, D. C.), for Equal Employment Opportunity Commission as amicus curiae.

Before SMITH, OAKES and TIMBERS, Circuit Judges.

SMITH, Circuit Judge:

These are appeals from orders of the United States District Court for the Northern District of New York, James T. Foley, *Chief Judge,* dismissing for lack of jurisdiction and failure to state a claim on which relief could be granted two actions alleging sex discrimination by Syracuse University in the employment of faculty members.[1] Plaintiff Selene Weise claims that she was denied a position and plaintiff Jo Davis Mortenson that she was terminated from her position on account of sex. Both plaintiffs sued the University, its Chancellor and Vice-Chancellor, and various faculty members and committees, seeking relief for a deprivation of constitutional rights, 42 U.S.C. § 1983;[2] for a conspiracy to

---

1. The cases were considered separately in the district court and separate appeals were docketed. We consolidated the appeals for oral argument.

2. § 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to

deprive them of the equal protection of the laws, 42 U.S.C. § 1985(3);[3] and for redress of violations of Title VII of the 1964 Civil Rights Act, as amended, prohibiting sex discrimination in employment, 42 U.S.C. § 2000e *et seq.*[4] They sought declaratory and injunctive relief, punitive and actual damages, and costs and attorneys' fees; Weise also demanded appointment to a position, while Mortenson claimed reinstatement. Judge Foley held that the complaints alleged insufficient indications of state action on the part of the University to support the claims under § 1983 and § 1985; that the actions sought relief for alleged discrimination which occurred while private universities were exempt from Title VII, and that the lifting of the exemption was not retroactive; and that in any event the plaintiffs' failure to file timely charges with the Equal Employment Opportunity Commission (EEOC) precluded their Title VII actions. Accordingly he dismissed the complaints. We reverse and remand for further proceedings.

## I. PLAINTIFFS' ALLEGATIONS

### A. *Weise.*

In 1969 Weise applied for a position as lecturer in the Department of Public Address at Syracuse University. She was turned down in favor of an allegedly less-qualified male. Thereafter, in January of 1970, she requested consideration for a teaching assistantship for the academic year 1970–71. Although Weise was hired for this position in March, 1970, she filed charges pursuant to the Human Rights Law of New York, Executive Law, McKinney's Consol.Laws, c. 18, § 290 *et seq.* (McKinney 1972), alleging sex discrimination in the denial of her application for the lecturer's position. On December 14, 1970, seven days after the hearing on that charge commenced, she was notified that her appointment as teaching assistant would be terminated at the end of the academic year. Sensing that this was no mere coincidence, Weise filed an additional charge, this time alleging retaliation. These complaints were dismissed by the State Division of Human Rights on April 21, 1972, and Weise's appeals were dismissed by the Division's Appeal Board on June 1, 1973. She also filed charges with the EEOC on May 8, 1972.

Undaunted by her previous rebuffs, on January 28, 1973, Weise wrote to defendant Irwin—who had participated in the 1969 decision not to hire her as a lectur-

---

be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**3.** § 1985. Conspiracy to interfere with civil rights—Preventing officer from performing duties

\* \* \* \* \* \*

(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an ac-

tion for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

**4.** The particular section outlawing sex discrimination in employment, 42 U.S.C. § 2000e–2(a), provides:

§ 2000e–2. Unlawful employment practices—Employer practices

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

\* \* \* \* \* \*

er—requesting consideration for any teaching position. When she received no response, she went to see Dr. Irwin, who acknowledged receipt of her letter but declined to discuss the matter. She then spoke to defendant Ried, who told her that he and Dr. Irwin had agreed not to grant any teaching assistantships to doctoral candidates—such as Weise—but rather to give priority to first year masters candidates. Weise alleges that on information and belief she was the only person affected by this decision; she further claims that at the time she was denied consideration for a teaching assistantship because she was a doctoral candidate, a male had his teaching assistantship renewed despite the fact that he was also a doctoral candidate. On June 25, 1973, she filed a new charge with the EEOC—consolidating it with her prior charge—regarding this denial of a teaching assistantship. On June 28, 1973, the EEOC issued a Notice of Right to Sue, 42 U.S.C. § 2000e–5(f)(1),[5] and on September 18, 1973, she commenced this action by filing her complaint in the district court.

### B. *Mortenson.*

Plaintiff Mortenson, who has a Ph.D. in English, was employed as an Assistant Professor in Syracuse's Department of English from 1966 through 1968, teaching lower and upper level undergraduate courses. According to the complaint, when defendant Bryant became chairman of the department in 1968 he gave her less desirable assignments in terms of courses and scheduling while assigning less qualified males to teach more desirable classes. In the fall of 1969, the tenured staff of the English Department met to consider the prospects for tenure of plaintiff Mortenson and three male faculty members, including Peter Mortenson, who was soon to become plaintiff's husband. Peter Mortenson and Donald Morton were advised that they would be recommended for tenure the following year; plaintiff Mortenson and Joseph Roesch were told that they would be terminated in June, 1971. In the fall of 1970, however, Roesch was extended until June, 1972, and plaintiff Mortenson was told by a tenured professor that Roesch's extension was granted because he was married and it was a difficult year to find work. In the fall of 1970, however, Bryant reaffirmed the decision to terminate plaintiff Mortenson—who by then had married Peter Mortenson—because tenure could not be granted to both a husband and wife. Plaintiff's appointment was terminated as scheduled, despite the fact that she held a Ph.D. and had some of her work published, whereas neither Roesch nor Morton, both of whom were retained, possessed either qualification.

Mortenson actively pursued a variety of administrative remedies. On December 10, 1970, she filed charges with the New York State Division of Human Rights. After a hearing, the Division held, in November, 1972, that plaintiff had not been discriminated against in violation of New York's Human Rights Law. This determination was upheld by the Division's Appeal Board on September 30, 1973.

Mortenson was somewhat more successful with the University's internal grievance procedures. In April, 1971, she filed charges with the Academic Freedom, Tenure and Professional Ethics Committee of the University Senate. Hearings were held before a ten-member panel in the spring of 1972, and in Janu-

---

**5.** § 2000e–5. Enforcement provisions—Power of Commission to prevent unlawful employment practices

\* \* \* \* \* \*

(f)(1) . . . If a charge filed with the Commission . . . is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge . . . the Commission has not filed a civil action under this section . . . or the Commission has not entered into a conciliation agreement . . . the Commission . . . shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent . . . by the person claiming to be aggrieved . . . ..

\* \* \* \* \* \*

ary, 1973, the panel issued its report, concluding that Mortenson's discharge had violated applicable procedure and was without adequate consideration of her qualifications. The panel divided equally on the issue of sex discrimination, however, and thus that charge was not upheld.

Armed with this favorable decision, Mortenson requested reconsideration of her termination. Her request was turned down by defendant Sutton (who had succeeded Dr. Bryant as chairman of the English Department) and the defendants Executive and Tenure Committees and their members, defendants Hoffman, Theiner and Burne. Mortenson maintains that this failure to reconsider her termination was invidiously motivated.

On September 24, 1973, Mortenson filed a complaint with the EEOC in Buffalo, alleging that her termination and the subsequent actions occurring "up to and including today" were in violation of Title VII. On September 27, 1973, the District Director dismissed the charge as untimely filed since the discriminatory acts complained of had occurred more than 300 days before the filing of the charges, 42 U.S.C. § 2000e–5(e), and issued a Notice of Right to Sue. On September 30, Mortenson advised the District Director that he had misinterpreted her charge, and she added two revised pages which made it clear that she was including the refusal to reconsider her termination as part of the course of discriminatory conduct. The District Director acknowledged receipt of her letter on December 3.

On December 7, Mortenson filed her complaint in the district court, alleging the issuance of the September 27, Notice of Right to Sue in satisfaction of the jurisdictional requirement of 42 U.S.C. § 2000e–5(f)(1). When it became clear to Mortenson's counsel that the defendants were claiming lack of jurisdiction for failure to file timely charges with the EEOC—the stated reason for the Commission's dismissal of the original charge—he sought a new Notice based on the amended charges. This Notice was issued on March 26, 1974, under a new case number.

## II. STATE ACTION

Whether the actions of a private university constitute state action, a prerequisite for maintenance of a suit under 42 U.S.C. § 1983, is a question that has been the frequent subject of this court's attention, with varying results. Disciplinary measures taken against students of the New York State College of Ceramics at Alfred University were held to qualify as state action because the College, while situated on an otherwise private campus, was in reality a state institution, publicly controlled and financed, although managed by private administrators. *Powe v. Miles,* 407 F.2d 73, 82–83 (2d Cir. 1968). On the other hand, a contrary conclusion was reached regarding the same disciplinary action taken against students at Alfred's Liberal Arts College since that school was not engaged in the performance of a public function and since those areas of its operations into which the State had injected its presence were neither so substantial nor so directly related to the particular activities at issue to warrant a holding of state action. *Id.* at 79–82. But when Wagner College, a private institution affiliated with a religious denomination and supported almost entirely by private funds, sought to discipline students pursuant to rules adopted in accordance with a New York State statute concerned with preventing campus disorders, we held that plaintiffs were entitled to a hearing to determine whether the disciplinary policy was in fact a state policy and the disciplinary action state action. *Coleman v. Wagner College,* 429 F.2d 1120 (2d Cir. 1970). *Coleman* in turn was distinguished, and *Powe* (as it applied to the Liberal Arts College) relied on, in *Grafton v. Brooklyn Law School,* 478 F.2d 1137 (2d Cir. 1973), rejecting for lack of state action a § 1983 claim that Brooklyn Law School and certain of its officials had retaliated against plaintiffs for their controversial views as

expressed in a student newspaper by deliberately giving them failing grades and ultimately dropping them from the school. The giving of examinations, though required by rules of the New York Court of Appeals, was held different from the enactment of disciplinary regulations pursuant to state statute for several reasons, the most important of which was that "Brooklyn Law School's giving of examinations has none of the symbolic character of the disciplinary Rules and Regulations of Wagner College which loudly announced that they had been adopted in accordance with the newly enacted statute." 478 F.2d 1137 at 1143. Finally, in *Wahba v. New York University,* 492 F.2d 96 (2d Cir.), *cert. denied,* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974), we rejected a claim of governmental action in a suit alleging deprivation of First Amendment and procedural due process rights by a participant in a federally-assisted research project. Dr. Wahba's salary was not paid with federal funds and, although the government required non-discrimination in employment, it disclaimed any intent to participate in other aspects of the project's administration. Moreover, we felt that there were "social values too obvious to require elaboration" in preserving the private nature of arrangements "whereby federal funds are used to prime the pump of research effort in private scientific institutions." 492 F.2d 96 at 102.

Although plaintiffs' claim of state action must be judged in light of these decisions, the applicability of precedent in state action cases should be tempered by the caveat that

> decisions dealing with one form of state involvement and a particular provision of the Bill of Rights [are not] at all determinative in passing upon claims concerning different

forms of government involvement and other constitutional guarantees.

*Wahba v. New York University, supra,* 492 F.2d 96 at 100.

■ As to the nature of the state's involvement, plaintiffs make several allegations. The University, they say, receives substantial amounts of state and federal money, both in grant form and in payment for services provided under contract. The extent of public aid is claimed to be such that the University is a quasi-public institution, unable to maintain its present level of efficiency and services without it. Moreover, attached to the federal funds are several strings, including the requirement for an affirmative action hiring program designed to increase minority and female faculty representation. Finally, the state's regulation and supervision of the University is claimed to be extensive.[6]

■ At the outset, the federal government's involvement can be discounted for jurisdictional purposes, since § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3), have no applicability to federal action. *Bivens v. Six Unknown Named Agents,* 456 F.2d 1339, 1346 (2d Cir. 1972). Whether a cause of action against federal officers might be fashioned directly under federal question jurisdiction, 28 U.S.C. § 1331, and the Fifth Amendment, *cf. Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 999, 29 L.Ed.2d 619 (1971) (cause of action exists to recover damages from federal officers for Fourth Amendment violation); *Wahba v. New York University, supra,* 492 F.2d 96 at 103–04 (question of whether Fifth Amendment *Bivens* action would lie left open because in any event insufficient governmental action was shown), is a question not before us since no such jurisdictional basis was alleged.

---

**6.** An additional basis for finding state action is set forth in the briefs on appeal, though not in the complaints: the claim that Syracuse is engaged in state action because it performs the public function of education. *Belk v. Chancellor of Washington University,* 336 F.Supp. 45 (E.D.Mo.1970); *Guillory v. Administrators of*

*Tulane University,* 203 F.Supp. 855 (E.D.La. 1962). We have rejected the public function argument in the past, *Grafton v. Brooklyn Law School, supra,* 478 F.2d 1137 at 1140 & n. 6; *Powe v. Miles, supra,* 407 F.2d 73 at 80, and we adhere to that position.

■ If our concern in this case were with discipline and the First Amendment, the alleged indicia of state action—funding and regulation—would most likely be insufficient. It has been held in such cases that the presence of state support, without more, does not make the state a partner or joint venturer[7] in the activity. *Wahba, supra,* 492 F.2d 96 at 100. Nor will state regulation unrelated to the challenged activity suffice, since "the essential point [is] that the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury." *Powe v. Miles, supra,* 407 F.2d 73 at 81. The allegations of support here are comparable to claims raised and rejected in *Wahba, supra; Grafton v. Brooklyn Law School, supra,* 478 F.2d 1137 at 1141–42; and *Powe v. Miles, supra,* and there is no contention that the state's regulatory powers were intertwined with Syracuse's employment practices to the degree that the statute was linked to the disciplinary rules in *Coleman v. Wagner College, supra,* 429 F.2d 1120.[8]

But this is only half of the inquiry; we must, as noted above, look to the nature of the right infringed as well as the extent of the state's involvement.[9] Plaintiffs contend that the right here abridged—to be free from discrimination on account of sex—should trigger a less exacting standard of state action. In both *Grafton v. Brooklyn Law School, supra,* 478 F.2d 1137 at 1142, and *Powe v. Miles, supra,* 407 F.2d 73 at 81, we explicitly noted that our findings of no

state action might be different if the cases involved discriminatory admissions policies.[10] Moreover, we have recognized the existence of a "double standard" in state action—"one, a less onerous test for cases involving racial discrimination, and a more rigorous standard for other claims," *Jackson v. The Statler Foundation,* 496 F.2d 623, 629 (2d Cir. 1974); plaintiffs urge that we categorize sex discrimination along with race discrimination on the "less onerous" side of the line.

■ The rationale for applying a different state action standard where discriminatory admissions policies are concerned rests on "the peculiar offensiveness of the state's taxing all citizens for objectives from the benefits of which a particular category is arbitrarily excluded or disadvantaged." *Powe v. Miles, supra,* 407 F.2d 73 at 82; *Grafton v. Brooklyn Law School, supra,* 478 F.2d 1137 at 1142 n. 12. While students may be thought to be the primary beneficiaries of public support for private education, we cannot ignore the fact that substantial benefits extend as well to the faculties of such institutions. There is, of course, the benefit of employment itself, but perhaps more significant than this, especially in the case of a major university such as Syracuse, is the provision of facilities for the furtherance of scholarship and research, the indispensable tools of the scholar's trade. The invidious withholding of these benefits from a particular class of the citizenry shares a similar degree of offensiveness with the arbitrary exclusion of a particu-

---

7. *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 177, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

8. If the anti-nepotism rule involved in Mortenson's case were promulgated at the demand, request or suggestion of state authorities, there would be a substantial claim of state action in the discriminatory application of a state-sponsored rule.

9. *See, Lopez v. Henry Phipps Plaza South, Inc.,* 498 F.2d 937, 942 (2d Cir. 1974) (finding of state action with regard to eviction by non-

profit redevelopment company not necessarily binding if same company were to impose rent increase).

10. State support of segregated schools through any arrangement, management, funds, or property cannot be squared with the [Fourteenth] Amendment's command that no State shall deny to any person within its jurisdiction the equal protection of the laws. *Cooper v. Aaron,* 358 U.S. 1, 19, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1958).

lar category of students. Moreover, the extent to which plaintiffs' interest in sharing in these benefits has been affected is extreme: they have been permanently excluded, not merely temporarily suspended, as in *Powe v. Miles, supra.* It is true that in *Grafton v. Brooklyn Law School, supra,* plaintiffs were dropped from the school, not merely suspended, and that in *Wahba v. New York University, supra,* plaintiff had been completely terminated from his position as research associate professor. In *Grafton,* however, the interest affected, while couched in First Amendment terms, came down to an interest in receiving passing grades. The vindication of that interest would have required this court to re-grade plaintiffs' examinations—a time-consuming and most unseemly task for a court, perhaps the most objectionable intrusion into a school's affairs imaginable. Similarly Dr. Wahba alleged a First Amendment violation, but his complaint was in reality directed against the practice of requiring advance approval of the principal investigator before publication of papers emanating from group research. Vindication of the claimed First Amendment interest there would again have involved judicial meddling in an area where courts should fear to tread: the ground rules governing the conduct of scientific research. Thus, while both *Grafton* and *Wahba* involved terminations rather than suspensions, vindication of the interests allegedly infringed was in both cases a peculiarly unsuitable undertaking for a court. The question involved here, however—whether or not invidious discrimination has occurred—is well within an area of recognized judicial competence, so that the vindication of plaintiffs' interests would be unlikely to lead a court to meddle in places where it has little business meddling.

■ As our discussion has hopefully demonstrated, a consideration of whether there is state action necessarily entails a balancing process. *See* Note, *State Action: Theories for Applying Constitutional Restrictions to Private Activity,* 74 Colum.L.Rev. 656, 661–62 (1974). As the conduct complained of becomes more offensive, and as the nature of the dispute becomes more amenable to resolution by a court, the more appropriate it is to subject the issue to judicial scrutiny. This explains the willingness to find state action in racial discrimination cases although the same state-private relationship might not trigger such a finding in a case involving a different dispute over a different interest. Class-based discrimination is perhaps the practice most fundamentally opposed to the stuff of which our national heritage is composed, and by far the most evil form of discrimination has been that based on race. It should hardly be surprising, then, that in race discrimination cases courts have been particularly vigilant in requiring the states to avoid support of otherwise private discrimination, and that where the conduct has been less offensive a greater degree of tolerance has been shown.

Plaintiffs contend that we should put sex discrimination in the same category of offensiveness as race discrimination. We are not, however, engaged in an all-or-nothing, pigeon-hole form of jurisprudence, and it is not necessary to put sex discrimination into the same hole as race discrimination to hold that in this case a less stringent state action standard should be employed than in the discipline cases. It is enough to note that the conduct here alleged—invidious class-based discrimination on account of sex—would appear, under the rationale articulated in *Powe* and *Grafton,* to be more offensive than the disciplinary steps taken in the prior cases, and that judicial resolution of this dispute will not entail interference with matters unsuited for review by a court.

■ The fact that the discipline cases are not controlling here does not answer the question whether, under a less stringent standard, the district court was correct in holding that the complaints failed sufficiently to allege state action. In *Jackson v. The Statler Foundation,* 496 F.2d 623, 629 (2d Cir. 1974),

we set forth five factors to be weighed in considering state action claims:

> (1) the degree to which the "private" organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a "private" organization in associational or other constitutional terms.

In this case, a substantial degree of financial dependence has been alleged. The defendants, on the other hand, submitted an affidavit of the University's Vice-Chancellor to the effect that in fiscal 1973 state funds constituted only 3.6% of the school's budget. If this were all, there would be little question of the result. In their briefs on appeal, however, plaintiffs assert the right to contest this figure at a hearing by demonstrating other sources of state support. In the present posture of the case, we are unable to resolve this factual dispute between the parties.[11] The second factor is also difficult to apply for lack of a record and findings by the district court; precisely how much control the state exercises in the hiring area is a factual question that could best be resolved after a hearing.[12] The third factor of *Jackson*—state approval as opposed to state passiveness—appears more clearly to be in defendants' favor, although the contrary might be true if Mortenson could establish that the state had a role in the adoption of the anti-nepotism rule. *See* note 8, *supra.* The fourth factor has been fairly well settled in opposition to plaintiff's claims. *See* note 6, *supra.* As for the fifth and final factor, we do of course recognize that a private university can make valid claims to retaining its private status,[13] but there comes a point where those claims are outweighed by the harm wrought on the public interest by "private" misdeeds—that is, by the offensiveness of the conduct. As we noted in *Wahba, supra,* 492 F.2d 96 at 101, reconciliation of *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), with *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961),

11. Financial dependence may be demonstrated by evidence other than budget figures. For example, in *Rackin v. University of Pennsylvania,* 386 F.Supp. 992, 1005 (E.D.Pa.1974), the district court found, after a hearing, that the University's administrators were so conscious of the need for currying favor with those who exercised the power over the state's purse that they actually made decisions contrary to what they believed was sound academic policy. *See also Holodnak v. Avco Corp.,* 514 F.2d 285 (2d Cir. 1975), where the financial dependence was so overwhelming to justify a finding that it went beyond mere support, and resulted in a "symbiotic relationship," *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 357, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), between Avco and the government.

12. While the degree to which the state's involvement through regulation concerns the activity complained of is relevant in determining whether state action should be found, *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 357, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172–73, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Powe v.*

*Miles, supra,* 407 F.2d 73 at 81, it is not a *sine qua non.* Direct regulatory involvement has been lacking in cases where the public and private entities were otherwise so closely intertwined that they formed a symbiotic relationship that could not be dissolved. *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Holodnak v. Avco Corp., supra,* note 11; *Rackin v. University of Pennsylvania, supra,* note 11, 386 F.Supp. 992 at 1003.

13. [T]he courts are probably wise in their reluctance to apply full constitutional protection to the private university setting, for application of the enormous array of duties imposed by the Constitution . . . would accomplish too much. Full application might, for example, raise questions about establishment or free exercise of religion, and might serve to undermine the advantages of diverse educational experiences which a variety of private universities can offer.

Note, *Common Law Rights for Private University Students,* 84 Yale L.J. 120, 122 n. 5 (1974).

must rest on the difference between a private club and a restaurant in a public building. However offensive the exclusion of blacks from a social club holding one of a restricted number of state liquor licenses, the Court thought it significantly less than their exclusion from a restaurant in a building owned and operated by a public authority and whose construction and maintenance were paid by public funds.

We are unable to say on this record that the University's claims to private status by themselves outweigh the peculiar offensiveness of the alleged misconduct.

Reviewing the *Jackson* standards, it appears that the record is insufficient, particularly on the first two factors, for us to determine whether Syracuse University was engaged in state action when it allegedly discriminated against Weise and Mortenson. Accordingly, we reverse the district court's dismissal, for failure to allege state action, of plaintiffs' claims under 42 U.S.C. § 1983, and we remand for a hearing[14] on that issue.[15] *Braden v. University of Pittsburgh*, 477 F.2d 1 (3d Cir. 1973).

■■■ The district court also dismissed plaintiffs' conspiracy claims under 42 U.S.C. § 1985(3) for lack of state action as well as for insufficient factual allegations of conspiracy. We have held that it was error to decide the state action issue under § 1983 without a hearing, but that is irrelevant to the § 1985(3) claims since it is clearly established that § 1985(3) embraces a limited category of private conspiracies, and that there is no state action requirement. *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The district court's dismissals of the § 1985(3) claims for lack of state action were therefore erroneous.

■■■ Of course, it would not be necessary to remand the conspiracy claims if the district court's alternative holding—insufficient factual allegations of conspiracy—is correct. However, a review of the complaints indicates that, although the allegations of conspiracy are sketchy, they are sufficient to withstand a motion to dismiss for failure to state a claim. Mortenson alleged that discriminatory actions were taken against her by the defendants collectively and in concert with invidious intent. While the pleading is somewhat general, and would benefit from particularization by way of amendment on remand, it does sufficiently allege an invidiously motivated agreement. Weise's complaint contains similar general allegations; as to defendants Irwin and Ried, however, a specific agreement is also alleged: the decision to limit teaching assistantships to masters candidates, which it is claimed was reached with the intent of depriving Weise of a position.

Since the two grounds relied on by the district court for dismissal of the § 1985(3) claims were erroneous, we reverse and remand for further consideration of those claims.[16]

14. In the interest of judicial economy, the district court on remand might consider consolidating these cases.

15. With respect to Weise, defendants claim that several of her allegations of discrimination under § 1983 are barred by New York C.P.L.R. § 214(2) (McKinney 1972), which is the applicable statute of limitations. *Romer v. Leary*, 425 F.2d 186, 187 (2d Cir. 1970). While several of the acts complained of did occur more than three years prior to the filing of the action (and we express no opinion as to whether, regarding those acts, the statute could be avoided by a claim of a continuous course of discrimination), several were clearly brought to litigation in a timely manner. We leave it to the district court on remand to determine where—if at all—the statute's line should be drawn, subject of course to the recent decision in *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) that the pursuit of Title VII administrative remedies does not toll the statute on other Civil Rights Acts claims.

16. Several issues regarding § 1985(3) occur to us, but since they were neither ruled on by the district court nor briefed to us, we leave it to the district court to decide whichever questions the parties raise on remand. The issues which we perceive include: whether sex discrimination is the kind of "class-based, invidiously discriminatory animus" necessary for a

## III. TITLE VII

### A. *Applicability.*

When Title VII was originally enacted, it exempted from its coverage

an educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution.

Pub.L. 88–352 § 702 (1964). This exemption was deleted, effective March 24, 1972, by § 3 of the Equal Employment Opportunity Act of 1972, Pub.L. 92–261.[17] The district court found with respect to Weise that "the latest arguable act . . . that is alleged to be discriminatory on the basis of sex is June 1971 which is the effective date of plaintiff's termination as a graduate teaching assistant," [18] and with respect to Mortenson that "the time of the alleged act of discrimination at the latest is June, 1971, the effective date of termination between plaintiff and Syracuse University." [19] Since both complaints alleged discrimination occurring prior to the lifting of the exemption for educational institutions, the district court held Title VII inapplicable.

 We do not agree with the district court's reading of the complaints. Weise alleged an independent act of discrimination in the refusal to consider her for a teaching assistantship in early 1973. As the Act explicitly states, 42 U.S.C. § 2000e–2(a)(1), and as the Supreme Court, *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (per curiam), and this court, *Gillin v. Federal Paper Board Co.*, 479 F.2d 97, 102 (2d Cir. 1973), have held, discriminatory refusal to hire is as illegal as discriminatory firing. Since Weise alleged a discriminatory refusal to hire occurring after the date on which Syracuse lost its exemption, she stated a claim to which Title VII applied, and the district court's conclusion that there was no allegation of discrimination occurring after June, 1971, was erroneous.

 Mortenson also alleged an independent act of discrimination occurring after March 24, 1972: the invidiously motivated refusal to reconsider her termination after the Faculty Senate's Hearing Panel issued its report in January, 1973. While this was, strictly speaking, neither a refusal to hire nor a discharge, Title VII is not so narrowly limited, but applies equally to other discrimination with respect to compensation, terms, conditions or privileges of employment. 42 U.S.C. § 2000e–2(a)(1). We think that the Act's sweep is sufficiently broad to include within the definition of discrimination with respect to terms, conditions or privileges of employment a discriminatory refusal, in violation of the employer's own established internal procedures, to reconsider an em-

---

§ 1985(3) conspiracy, *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), *see Pendrell v. Chatham College*, 386 F.Supp. 341, 348 (W.D.Pa.1974); whether, even if sex discrimination in general does not qualify, sex discrimination in violation of a specific federal statute—here, Title VII—does; whether a holding that the enactment of Title VII gives rise to a conspiracy action under § 1985(3) is consistent with the elaborate scheme of administrative remedies provided in Title VII, *see* H. Friendly, *Federal Jurisdiction: A General View* 82–87 (1973); and whether officials of a single corporation can, in legal contemplation, conspire with one another, *compare, Cole v. University of Hartford*, 391 F.Supp. 888 (D.Conn.1975), *with Rackin v. University of Pennsylvania*, 386 F.Supp. 992, 1005–06 (E.D.Pa.1974). Of course, by listing the issues which occur to us, we by no means intend to deny the possibility of others.

**17.** The pertinent section, codified as 42 U.S.C. § 2000e–1, now provides:

§ 2000e–1. Subchapter not applicable to employment of aliens outside State and individuals for performance of activities or religious corporations, associations, educational institutions, or societies

This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

**18.** Appendix of Appellant Weise at 9.

**19.** Appendix of Appellant Mortenson at 9.

ployee's termination.[20] Therefore, the district court's holding that Mortenson had alleged no act of discrimination occurring after Title VII became applicable to Syracuse was also erroneous.

## B. Retroactivity.

Plaintiffs urge us to go one step further and hold that, regardless of whether the complaint alleged discriminatory acts occurring before March 24, 1972, that date is irrelevant, since Title VII should be applied retroactively.

In *Brown v. General Services Administration*, 507 F.2d 1300 (2d Cir. 1974), *cert. granted*, 421 U.S. 987, 95 S.Ct. 1989, 44 L.Ed.2d 476 (1975), we held that the lifting of the federal government's exemption from Title VII (which also occurred on March 24, 1972) was to be applied retroactively to cases pending administratively as of the time the amendment removing the exemption became effective. That decision is not necessarily applicable here, however, since this case deals with employees of educational institutions, not of the federal government. The difference is significant because of the different situations of both groups of employees prior to the 1972 amendments.

Title VII originally excluded the United States from the definition of "employer," Pub.L. 88–352 § 701(b) (1964), but included a specific proviso declaring it to be the policy of the United States to insure equal employment for federal employees and directing the President to utilize his existing authority to effectuate this policy. *Id.* As we noted in *Brown, supra*, 507 F.2d 1300 at 1304, complaints of discrimination by federal employees were thereafter covered by Executive Orders and agency regulations.

In general, the [employing] agency itself conducted an investigation and hearing on such complaints. Although the hearing examiner might come from an outside agency, especially the

CSC [Civil Service Commission], the head of the employee's agency made the final agency determination. Appeal lay only to the Board of Appeals and Review of the CSC.

*Id.* (footnote omitted). The 1972 amendments to Title VII, Pub.L. 92–261 § 11 (1972), added to the Act § 717, 42 U.S.C. § 2000e–16, providing "a private right of action for federal employees who were not satisfied with the agency or CSC decisions." *Brown, supra*, 507 F.2d 1300 at 1304. Federal employees were still to seek relief in the first instance from their own agencies, but whereas previously the only appeal was to the CSC, the amendment gave employees a right to go directly to court, or to appeal to the CSC and then go to court. 42 U.S.C. § 2000e–16(c). The question in *Brown* was whether this right of action was to be held available to a federal employee who was allegedly discriminated against prior to the effective date of the amendments but whose complaint was pending administratively at that time. We held that it was.

Employees of educational institutions were in an entirely different situation prior to the 1972 amendments. As we noted in Part IIIA, *supra*, these employees were absolutely exempt from the Act's coverage; there was no alternative federal administrative remedy by which they could pursue their claims of discrimination. Prior to the 1972 amendments, Syracuse University was free, as far as Title VII was concerned, to discriminate in its employment practices. To hold that its actions during that period of exemption can now be the basis for the imposition of liability would be quite different from *Brown's* holding that a statute providing for judicial review of formerly unreviewable administrative proceedings is to be applied to such proceedings pending at the time of the statute's enactment. To put it another way, *Brown* gave retroactive application to a statute providing a new forum for the

---

**20.** Alternatively, the complaint might be construed as alleging a continuing course of discriminatory conduct. *See Cox v. United*

*States Gypsum Co.*, 409 F.2d 289, 290–91 (7th Cir. 1969); *Rackin v. University of Pennsylvania*, 386 F.Supp. 992, 1006–07 (E.D.Pa.1974).

enforcement of preexisting rights; here we are asked to give retroactive effect to a statute creating new rights where none had previously existed. The manifest injustice [21] of such *ex post facto* imposition of civil liability is reflected in the general rule of construction that absent clear legislative intent statutes altering substantive rights are not to be applied retroactively. *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *Farmington River Power Co. v. Federal Power Commission*, 455 F.2d 86, 90 (2d Cir. 1972); *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 274 F.2d 608, 610 (2d Cir.), *cert. denied*, 363 U.S. 811, 80 S.Ct. 1247, 4 L.Ed.2d 1153 (1960). In *Brown*, we reviewed the legislative history of the 1972 amendments regarding federal employees and concluded that Congress intended simply to create a new means for enforcement of preexisting rights [22]—a purpose entirely consistent with the retroactive construction there adopted. Here, however, the intent was clear to impose new substantive requirements on educational institutions.[23] *See* H.R.Rep. No.92–238, 92d Cong., 2d Sess. (1972), *quoted at* 1972 U.S.Code Cong. & Admin. News, pp. 2137, 2154–55. We therefore hold that the 1972 amendments subjecting educational institutions to the requirements of Title VII are not to be applied retroactively.[24]

## C. *Compliance with Procedural Requirements.*

Title VII is rife with procedural requirements and time limitations that must be met before a claim of discrimination in employment can be brought to the attention of a federal court. If the alleged unlawful employment practice occurs within a state or locality having a law prohibiting such a practice,[25] an aggrieved person cannot file a charge with the EEOC until 60 days have elapsed after the commencement of such state or local proceedings. 42 U.S.C. § 2000e–5(c). Resort to the EEOC thereafter is conditioned on the filing of charges not more than 300 days after the occurrence of the alleged unlawful practice or 30 days after the termination of state or local proceedings, whichever is earlier. 42 U.S.C. § 2000e–5(e). If, on the other hand, there is no such state or local law, charges may be filed directly with the EEOC, but the time period is reduced to 180 days from the date of the occurrence. *Id.* Once it receives a charge, the EEOC investigates; if it finds no reasonable cause to believe that the charge is true, it dismisses the charge, but if it finds reasonable cause it attempts conciliation. 42 U.S.C. § 2000e–5(b). If conciliation fails, the Commission can institute a civil action against the respondent. 42 U.S.C. § 2000e–

21. *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 716–17, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

22. *Accord, Bowers v. Campbell*, 505 F.2d 1155, 1159 & n. 6 (9th Cir. 1974).

23. It might be argued that plaintiffs did in fact have a right not to be discriminated against in employment prior to March 24, 1972, similar to that enjoyed by federal employees, and that therefore the 1972 amendments should be construed, as they were in *Brown*, as simply adding a forum for the enforcement of that right. It is true that plaintiffs allege that Syracuse was a government contractor, and that Executive Order 11246, 30 Fed.Reg. 12319 (1965), as amended by Executive Order 11375, 32 Fed. Reg. 14303 (1967) and Executive Order 11478, 34 Fed.Reg. 12985 (1969), prohibits sex discrimination in employment. That Executive Order, however, does not give rise to a privately maintainable cause of action; enforce-

ment is provided for only by the Department of Labor. *Rackin v. University of Pennsylvania*, 386 F.Supp. 992, 1008 (E.D.Pa.1974). The existence of the Order thus does not alter the conclusion that the 1972 amendments created a new cause of action.

24. Of course, the fact that pre-amendment actions do not give rise to independent violations of Title VII does not mean that evidence of such activity would be inadmissible for the purpose of showing a pattern of conduct or the purpose, motive or intent of the post-amendment actions. *United States v. Jacksonville Terminal Co.*, 451 F.2d 418, 441 (5th Cir. 1971), *cert. denied*, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972).

25. New York's Human Rights Law is such a law. Executive Law § 290 *et seq.* (McKinney 1972).

5(f)(1). If the EEOC dismisses the charge, or if within 180 days after filing the Commission has neither effected conciliation nor instituted a civil action, it is to notify the aggrieved party, who has 90 days after the giving of such notice to commence an individual civil action. *Id.* The procedures thus mandated exist not for their own sake, but rather in furtherance of substantive purposes: the promotion of dispute resolution through accommodation rather than litigation, H. Friendly, *Federal Jurisdiction: A General View* 78 (1973), and the expeditious handling of complaints, *Love v. Pullman Co.*, 404 U.S. 522, 526, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972). Therefore, although compliance with these requirements is a jurisdictional prerequisite to maintenance of a civil action, *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306, 309 (2d Cir. 1975); *Choate v. Caterpillar Tractor Co.*, 402 F.2d 357, 359 (7th Cir. 1968), the rigid insistence on meticulous observance of technicalities unrelated to any substantive purpose is inappropriate. *Love v. Pullman Co., supra*, 404 U.S. 522 at 527, 92 S.Ct. 616.

■■■ The district court held that Weise's filing of charges with the EEOC was not timely. We disagree. Although the May 8, 1972, charge was filed more than 300 days after the allegedly discriminatory termination in June, 1971 (which in any event was not covered by the Act), a second charge, consolidated with the first, was filed on June 25, 1973. That charge alleged the discriminatory refusal to hire after the letter of January 28, 1973, and was clearly filed within 300 days thereafter. There are two possible arguments for holding that the proper procedures were nonetheless not followed: first, that the EEOC, by issuing a Notice of Right to Sue on June 28, only three days after the filing of the ·charge, failed to comply with the requirement that the Notice not issue until

180 days after filing in order to give the conciliation machinery a chance to work, 42 U.S.C. § 2000e–5(f)(1); second, that the charge was not properly before the EEOC because it had not first been presented to the appropriate state authority. 42 U.S.C. § 2000e–5(c). We find neither argument persuasive. While it is true that, absent the dismissal of a charge by the EEOC, the Notice should not issue until the charge has been before the Commission for at least 180 days, in this case there was a prior charge against the same employer that had been pending for more than the required time, and it was clear that no conciliation was likely. There was thus little reason to think that the second charge—alleging a continuing course of discrimination—would have ended in conciliation. To require the EEOC to hold the second charge for 180 days would not have advanced the conciliation purposes of the Act and would only have served to delay the proceedings, contrary to the Act's policy of handling claims expeditiously. In the circumstances of this case, therefore, we decline to hold that the issuance of the Notice three days after the filing of the charge was contrary to the procedural requirements of the Act. Similarly, we decline to fault Weise for failing to bring the 1973 refusal to hire to the attention of the New York State Division of Human Rights before filing her 1973 charge with the EEOC. The initial reference of her case to the state forum was sufficient.

> To force an employee to return to the state agency every time [s]he claims a new instance of discrimination in order to have the EEOC and the courts consider the subsequent incidents along with the original ones would erect a needless procedural barrier.

*Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir. 1973).[26]

---

26. If—and we do not decide this question—the fact that Weise did not have to call subsequent discriminatory acts to the state agency's attention meant that her time limit for reporting them to the EEOC was reduced from 300 days to 180 days, her June 25, 1973, charge was nonetheless timely since the acts complained of occurred after she wrote her letter on January 28, 1973.

The district court found that Mortenson had not complied with the Act for two reasons: her initial charge with the EEOC was untimely, and was in fact dismissed by the Commission on that basis; and the Notice of Right to Sue based on the second charge, issued after the commencement of this action, would not cure the original defect.

■ Mortenson's original charge was filed with the EEOC on September 24, 1973, alleging discrimination "up to and including today." The dismissal on September 27 was based on the supposed untimeliness of that charge, and the district court adopted the Commission's finding on that issue. We hold that this was error. The district court was not bound to accept the Commission's determination on this question as binding; a contrary holding would make meaningless the right to sue after dismissal by the Commission. 42 U.S.C. § 2000e–5(f)(1). And while the EEOC's findings are ordinarily entitled to great weight, here it seems clearly to have misread the charge. We hold that there was a timely filing with the Commission with respect to the allegedly discriminatory refusal to reconsider Mortenson's termination, and that the first Notice of Right to Sue satisfied the jurisdictional prerequisites of the Act.[27]

■ Moreover, with respect to the second Notice, the district court's attitude was too uncompromising. While it might have been somewhat irregular to accord *nunc pro tunc* status to that No-

tice, issued as it was while the suit was pending, the district court should at least have allowed Mortenson to amend her complaint to include it. As it was, Mortenson found herself out of court because the EEOC had misread her original charge and because the district court had refused to recognize the steps she took in attempting to correct the situation. This application of the procedural requirements of Title VII is out of tune with the benevolent purposes of the Act. Mortenson did all she might be expected to do in order to get her case before the district court. The district court's holding that she failed to do so must be reversed.

## IV. CONCLUSION

To summarize:

1. We reverse the dismissal of plaintiffs' claims under 42 U.S.C. § 1983 and remand for a hearing on the issue of state action;

2. We reverse the dismissal of plaintiffs' claims under 42 U.S.C. § 1985(3) and remand for further proceedings;

3. We agree with the district court that Title VII is not to be applied retroactively to educational institutions, but we reverse the holding that no unlawful employment practices occurring after the Act's effective date were alleged, and we also reverse the determination that plaintiffs failed to comply with the Act's procedural requirements.[28]

Reversed and remanded.

---

**27.** An appropriate remedy in a case where the EEOC erroneously dismisses on jurisdictional grounds might ordinarily be a remand to the Commission. Here, however, the Commission's District Director, in conjunction with the second Notice of Right to Sue, advised Mortenson that the Commission's backlog was such that in any event it would not have been able to act on the charge within 180 days. In

such circumstances, a remand to the Commission would be an exercise in futility.

**28.** The district court refused to certify these actions as class actions, and plaintiffs challenge that determination on appeal. In light of our disposition of the other issues, the district court on remand should reconsider the class action question.