**Robert JANUSAITIS**

v.

**MIDDLEBURY VOLUNTEER FIRE DEPARTMENT et al.**

**Civ. No. N–78–67.**

United States District Court, D. Connecticut.

Jan. 26, 1979.

Frederick W. Krug, Waterbury, Conn., for plaintiff.

Anthony M. Fitzgerald, John F. Bullock, Carmody & Torrance, Waterbury, Conn., for defendants.

## MEMORANDUM OF DECISION

ELLEN B. BURNS, District Judge.

This case springs from the August, 1977, suspension and November, 1977, dismissal of the plaintiff, Robert Janusaitis, from the Middlebury Volunteer Fire Department for, among other things, "unbecoming conduct detrimental to the welfare or good name of the Department." The plaintiff claims that each incident violated his First Amendment right to free speech and his Fourteenth Amendment right not to be deprived of a property interest with-

out due process of law. He is thus suing the Chief of the Department and all the members of its Executive Committee individually and in their official capacities, invoking jurisdiction pursuant to 42 U.S.C. §§ 1983, 1985, and 1988, and praying for a declaratory judgment that his suspension and expulsion were invalid, an injunctive order reinstating him in the Department, damages, attorney's fees and costs. The defendants assert that there is no state action sufficient to sustain a claim under these statutes, that there were sufficient grounds outside the scope of the First Amendment to justify the plaintiff's suspension and dismissal, and that the plaintiff was provided more than adequate due process given that his membership in the Department did not rise to the level of a property interest. This Court finds, first, that the action of the Middlebury Volunteer Fire Department in suspending and dismissing the plaintiff does not constitute state action within the meaning of 42 U.S.C. § 1983, and second, even were there state action, an examination of the merits discloses that this is not a free speech case since there were sufficient grounds to dismiss the plaintiff independent of any First Amendment considerations, and further that the plaintiff's due process rights were not violated by his suspension and dismissal.

## I

## FACTS

■ The Town of Middlebury ("Town") is a small rural community lying to the southwest of Waterbury, Connecticut. It has a population of 7,000 spread throughout an area of approximately 29 square miles. The Middlebury Volunteer Fire Department ("MVFD" or "Department") was established in January of 1941 following a special town meeting. Its express purpose is to preserve lives and property by fighting fires in the Town of Middlebury. During the past several years there have been between 45–50 members and officers in the Department. Its members are all volunteers, and it uses, free of charge by the Town, buildings and equipment purchased and owned by the Town. In its budget for the fiscal year 1976–77, the Town provided the sum of $37,714 for fire protection, and the Town reimburses the members of the Department for their travel expenses to and from fires in the amount of two dollars for each call, with officers receiving slightly more. The MVFD performs the duties of fighting fires within Middlebury pursuant to an agreement with the Town under the authority of C.G.S. § 7–301. Under C.G.S. § 7–308 the Town is obligated to indemnify volunteer firemen for any damages they become liable for in the course of performing their duties and the firemen are construed to be employees of the municipality for whose benefit they render services for purposes of workmen's compensation benefits under C.G.S. § 7–314a. The MVFD nevertheless functions as a relatively independent organization: its members promulgate its Constitution, By-Laws, and Rules and Regulations, organize and conduct training exercises, elect officers, raise funds through a variety of activities such as a yearly carnival, and discipline members, all without any involvement of the Town (except that the election of the chief is subject to ratification by the Town's Board of Selectmen).

The plaintiff Robert Janusaitis joined the MVFD in 1973 at the age of 18. On November 14, 1976, the membership elected him lieutenant for a one-year term by a plurality of one vote. He was then 21 years old. His duties as an officer included the responsibility to lead members responding to fire and ambulance calls, to be in charge when no other officers were at the scene, and to perform various training and administrative tasks. During his term as officer the plaintiff advocated a number of changes in the Department's operations and made numerous criticisms of the Department and its members. In April of 1977 he submitted a lengthy memorandum ("April Report") containing a breakdown of his criticisms and suggestions to the Executive Committee, a small body of non-officers constituted for the purpose of representing the interests of the general members to the

officers, acting as an appeal board from the disciplinary decisions of the Chief, and providing a policy review board for the officers. These issues revolved around the accounting practices of the Department (which the plaintiff alleged violated generally accepted accounting principles), officers (in that they allegedly violated Department rules and regulations, failed to delegate authority, and were inadequately trained), and members (citing declining attendance at calls and training drills allegedly due to poor morale). During the months of April, May, and June the Executive Committee met several times to discuss the issues raised by the April Report, including meeting with the Treasurer and the officers who had personal knowledge of those issues.

Dissatisfied with the progress the Executive Committee was making upon his April Report, in July, 1977, the plaintiff drafted a letter addressed to the Commissioner of the Internal Revenue Service ("IRS letter") stating:

I hereby relinquish myself from all liability both financially and crimminally [sic] from any action against the Middlebury Volunteer Fire Department, concerning their accounting procedures.

I have notified the department that they are violating the Internal Revenue Code and generally accepted accounting principles.

I can document all my findings.

The letter indicated that copies were sent to the Chief, the Executive Committee, and the First Selectman of the Town. The plaintiff handed a copy of the letter to the Chief and to the Chairman of the Executive Committee and indicated that he would mail the original to the IRS if the Department did not promptly change its accounting practices. The Executive Committee considered this threat to be improper, and urged the Chief to discipline the plaintiff. The Chief, defendant Edward St. John, was disturbed by the letter's inference of criminal activities in the Department, and felt some disciplinary action to be in order. After speaking to the plaintiff, the Chief executed an informal suspension pending fur-

ther investigation by asking the plaintiff to "make himself scarce" around the firehouse. Subsequently the Executive Committee formally recommended that a 30-day suspension be imposed, and in late July, the Chief suspended the plaintiff for one month, beginning August 1, 1977, for "unbecoming conduct detrimental to the welfare or good name of the Department" (By-Law § 12), citing the IRS letter. The Chief explained to the plaintiff that the IRS letter constituted a violation of the Department's unwritten rule and protocol that all criticism of Department operations be first brought up "in the house" rather than presented to outside authorities in an effort to force change from without by circumventing the officers and members. The plaintiff admitted he was aware of the Department's policy against such unauthorized statements, and conceded that his conduct concerning the IRS letter had been mistaken. The Chief told the plaintiff that should any other such letter-writing incidents occur in the future he would be automatically dismissed. The plaintiff sought a review by the Executive Committee of his suspension, and the Committee, believing itself to be thoroughly informed as to the IRS letter incident, affirmed the suspension.

The plaintiff returned to active duty as a member of the MVFD on September 1, 1977. On September 4, 1977, he wrote a letter to the Chief in which he stated:

In regard to my recent 30 day suspension I believe that there was a malicious intent on the part of the officers and executive committee. You knew or should have known that the allegations in the circumstance were false and untrue and there was no reasonable or probable cause for the allegations.

The actions of the officers and executive committee were used in malicious intent, unjustly to vex, harass and trouble me. The reckless and imprudent conduct by the officers and executive committee was a violation of my rights as a citizen of the United States. . . .

However binding an obligation may be between members of the organization,

such an organization is subject to the laws of the country. The laws of the country do indeed insist that giving testimony is a matter not of choice, but of civic duty.

I have been used as a pawn in a political sandbox. . . .

The actions involved in this incident were illogical, immoral and unethical for individuals whose [sic] supposedly represent a respectable organization.

I expect an *immediate* apology from the officers and executive committee at our next monthly meeting.

On September 8, 1977, a law firm retained by the plaintiff sent a letter to the Chairman of the Executive Committee. The letter reviewed the events leading up to the plaintiff's suspension, and concluded "It would appear that the process by which Mr. Janusaitis has been suspended violates fundamental principles of fairness and due process." The attorney requested the Committee rescind its action and expunge any record of the plaintiff's suspension, closing with the statement "I believe such a course of conduct will alleviate the necessity of having to litigate this matter in the State Courts."

Following his return to active duty, the plaintiff continued to advocate reforms within the Department. Still dissatisfied with what he perceived to be the lack of response to his criticisms, the plaintiff delivered a letter to the First Selectman of the Town on October 24, 1977 ("Cover-up letter"). The letter consisted of a cover page entitled "Re: Pending Suit Against Middlebury Volunteer Fire Dept." and stating that "Attached is a copy of a letter which will be sent to the news media within seven (7) days." The attached letter was addressed to the Editor of the Waterbury *Republican and American* (with copies to a radio-TV station and two other local newspapers). After a brief reprise of the circumstances leading to his suspension, the letter reads:

Why did the First Selectman refuse to listen to me, was he afraid it would also show his lack of respect for the law?

Whether an organization is paid or volunteer, it still must conform to the laws of our land.

What is the Fire Department and the First Selectman trying to cover up?

It is with deep regret that I must bring court action against the Middlebury Volunteer Fire Department for violating my rights as a citizen of this country.

The date of this letter is significant in that the First Selectman, Mr. William Longo, was engaged in a reelection campaign at the time. Mr. Longo telephoned the plaintiff, and on October 28, 1977, the plaintiff sent the First Selectman a letter detailing his criticisms of the Department's financial practices. A week later the Chief and his ranking officers were at the First Selectman's office to discuss the Town's making of a formal bid for a new ambulance. After that business was concluded, the First Selectman handed the plaintiff's October 24th "cover-up letter" to the Chief. The Chief read it there for the first time, and then turned to his First Deputy Chief, John J. Proulx, Jr., and said, "Jack, this is it—he's got to go." It was at that moment the chief decided to dismiss the plaintiff. However, the Chief gave his personal promise to the First Selectman that he would not discuss the Cover-up letter with anyone until after the election (at that point one week away).

On November 4, 1977, the First Selectman wrote the plaintiff a letter stating that he could not answer the plaintiff's questions concerning the financial practices of the Town in view of the pending lawsuit and of a pending evaluation of the Town's financial system by an auditing firm. In early November an anonymous caller contacted a reporter at the Waterbury *Republican and American* concerning the plaintiff's suspension and subsequent allegations. A reporter thereafter had a number of conversations with the plaintiff concerning the matter, some by telephone and some in person. The newspaper ran a story on Saturday, November 5, 1977, entitled "Fireman Tells Story After Reinstatement." Part of the account reads:

Janusaitis, an accountant, claims the Middlebury Fire Department needs to have its own federal income tax number as a non-profit organization, since it is a private group in addition to being the town's firefighting unit.

Janusaitis said Friday he had not yet brought the alleged violation to the attention of the Internal Revenue Service "because I was going to give them (the department) another opportunity to straighten things out," but said he will be forced to take action if the department doesn't.

Janusaitis was suspended in August for 30 days after he gave to the department's executive committee a report in April criticizing several aspects of departmental operations.

Janusaitis said he now has an attorney and may sue the department because he was denied an appeals hearing on his suspension by the executive committee. He claims this was a denial of due process.

The next day Chief St. John sent the plaintiff a letter summoning him to appear before a meeting of the officers of the Department "to discuss your recent conduct in statements made and documented in public which may constitute conduct detrimental to the good of the Department."

The meeting was held on Wednesday, November 9, 1977. The plaintiff appeared and was represented by counsel throughout the proceedings. After this meeting, the plaintiff requested a written list of reasons for his dismissal and an appeal to the Executive Committee. He was given both. On November 20, 1977, Chief St. John sent the plaintiff a letter detailing the violations of the MVFD By-Laws which resulted in his dismissal. The first five violations concerned what the Chief perceived to be the plaintiff's failure to perform assignments and dereliction of other duties. The last five read as follows:

6. Threatening the Executive Committee of the MVFD by writing a letter to the IRS accusing the Department of criminal activities.

7. Threatening legal action against the Town of Middlebury and the MVFD in a letter to the Chief, if suspension is not rescinded.

8. Misinformed the public in a newspaper article, stating a suspension was received for criticizing the Department in a report submitted to the Executive Committee. Suspension was for the threat to the Executive Committee in a writing of a letter to the IRS, and since the letter was written . . . without any authorization from the Department.

9. Threatened the First Selectman of the Town of Middlebury with an ultimatum if he did not comply with the requests made in a letter to him.

10. Contributed to the decline of morale and participated in activities detrimental to the good welfare of the Department.

The Executive Committee subsequently met with the Department officers to determine and document the grounds for the plaintiff's dismissal. The Executive Committee held two further meetings in order to afford the plaintiff an opportunity to present his side of the story. The plaintiff attended both meetings with counsel, and presented testimony on his behalf. At the second of these meetings the plaintiff requested the opportunity to cross-examine Chief St. John. This request was denied. At one meeting the plaintiff alleged that the Chairman of the Executive Committee had made a derogatory remark concerning the plaintiff in November of 1976, and requested that member disqualify himself as biased. This request was discussed by the members of the Committee and also denied. The Committee upheld the Chief's dismissal of the plaintiff by unanimous vote, and so informed him by written notice on January 10, 1978. The instant suit was filed by the plaintiff on March 20, 1978.

The plaintiff's requests for a temporary restraining order and permanent injunction and for a trial on the merits were consolidated and heard by this Court on October 24, 25, and 30, 1978. From the testimony given by all the parties at that hearing, it is

clear that early in his involvement with the MVFD, the plaintiff developed a special interest in the ambulance service the Department provided for the Town. The plaintiff felt he was underutilized in the Department, and particularly felt he was entitled to more authority over matters concerning the ambulance. Plaintiff's claims at trial that his motive in criticizing the operations and personnel of the Department via numerous memos and reports was to advance the efficiency of the Department and so render the highest possible degree of service to the public; that he had no personal illwill against any of the officers, no desire to embarrass or show-up any officer, no intention to cause dissension, and no desire to enhance his power or position within the Department; that he never attempted to separate Captain Dawes from the Chief over the operation of the ambulance service; that he had no interest in "attacking" the Department in March, 1977, and that all his actions were done with the best interests of the Department in mind, are seriously impeached by a letter which he wrote to a fellow member of the MVFD, Dave Dundas, on March 23, 1977, indicating his intention to change the operation of the Department and undermine the authority of its officers.[1]

Further, before presenting the Chief and the Executive Committee with his IRS letter ultimatum, the plaintiff made no effort to ascertain the likelihood of the IRS pursuing criminal sanctions against the members of a volunteer fire department for failure to file for a tax-exempt number. The plaintiff similarly made no effort to ascertain whether the Executive Committee was taking action on his April Report before presenting his IRS letter ultimatum when, in fact, of the 17 meetings held by the Committee between April and December of 1977, 16 were convened to deal with matters concerning the plaintiff which flowed from his filing of the April Report. In the spring of 1977 the Committee met with the Treasurer and were informed the Department's books were in proper order, and at the regular meeting of the Department on July 11, 1977, a committee was appointed to investigate the tax exempt status and accounting policies of the Department.

The MVFD responded to the criticisms in the plaintiff's April Report in the ponderous but deliberate manner inherent to the operation of most purely volunteer organizations. By the fall of 1978, the Department's investigation had resulted in its formal incorporation and its official application to the IRS for tax-exempt certification. The fact that the plaintiff found this volunteer Department's pace of change intolerably slow merely testifies to his immaturity and unreasonableness. The depth of his resentment at not being given more authority over the ambulance operations and the intensity of his bitterness toward individual senior officers and members was both misplaced and unrealistic. It would indeed be

---

1. I will be home for 12 days starting April 1st. I have a few bombshells I'm going to drop. I will explain my plan when I see you. . .

You should be ashamed of yourself picking on poor [Second Deputy Chief] Rich Nicol. I think people will begin to see the light when they find out that the people who are claiming to be doing so much aren't doing anything. i. e. Training? Registration for the ambulance? How can these people be doing their job? Could it be that other people used to do it, but now refuse to because they are sick and tired of someone taking credit for something their [sic] not doing?

We will have to see what happens? You have my support for anything you can do (talking to Longo, or St. John). I'm sick of Nicol and Dawes playing games.

I *guarantee* a major change in the operation of the department after the April meeting, which [sic] I will disclose my research plans which state the *facts* of how things are being done. I have separated [Captain] Dawes high and mighty attitude by one memo to St. John. Wait until I hit them with my latest weapon.

Nicol knows I'll fry him on the first opportunity, he is losing control of everything he had. You didn't ask for his assistance, he's mad, *good*. I'm not going to ask him for anything for my April 5 & 6th course, that should fry him.

After I begin my attack in the beginning of April I'm not going to let up until I get what is right, thrown out or shot.

surprising if a group of men with decades of volunteer firefighting experience abruptly ceded authority over a crucial area of the Department's operation to a 21 year old youth. Rather than deal with his youthful impatience and frustration in a reasonable manner, the plaintiff devised an "attack" against the Department which he pursued in the most provocative and divisive manner possible. He habitually made derogatory comments to his contemporaries in the Department about virtually all other members of the MVFD (and especially about the officers in charge of the ambulance service), and chose to ignore the sound advice of these same contemporaries that he "slow down" and "take it easy" or risk hopelessly alienating the rest of the membership. In short, the plaintiff emerges as one more concerned with proving himself right and everyone else wrong than with truly promoting the welfare and efficiency of the Department.

This Court finds that the reason for the plaintiff's dismissal was not his consenting to an interview with a newspaper reporter but rather the reason cited by Chief St. John, namely, a pattern of disruptive behavior climaxed by his October 24, 1977, Cover-up letter to the First Selectman. It is clear that the plaintiff would have been dismissed, even in the absence of the newspaper article, since the Chief decided to dismiss him several days before the article appeared. The plaintiff's October 24th letter to the First Selectman fell into the same pattern as the earlier letters and represented a serious enough compounding of his previous disruptive behavior to justify his dismissal.

## II

## STATE ACTION

■ Plaintiff has claimed violation of his First, Fifth and Fourteenth Amendment rights by his suspension and expulsion from the MVFD. To prevail in this action, the plaintiff must not only prove the violations of which he complains but also that the conduct involved was state action or action "under color of law."

In this connection, he claims that the MVFD must be deemed a governmental body whose regulations are subject to constitutional scrutiny because the Town owns the land, buildings, and equipment used by the Department, because the Town participates in the financial affairs of the Department, and because the Department performs a governmental function for the Town. The defendants assert that the total absence of state or Town involvement in the membership practices of the MVFD (including the disciplinary proceedings of the plaintiff) precludes, as a matter of law, a finding of state action.

■ In its most recent ruling in this area of the law, the Supreme Court, speaking through Mr. Justice Rehnquist, noted, "We express no view as to the extent, if any, to which a city or State might be free to delegate to private parties the performance of such functions [as fire and police protection] and thereby avoid the strictures of the Fourteenth Amendment." *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 163, 98 S.Ct. 1729, 1737, 56 L.Ed.2d 185 (1978). However, state action has been found by district courts when a municipal government was financially involved with a volunteer fire company which was found to be discriminating on the basis of race. *Everett v. Riverside Hose Company No. 4, Inc.,* 261 F.Supp. 463 (S.D.N.Y.1966); *Williams v. Rescue Fire Co.,* 254 F.Supp. 556 (D.Md.1966). Since there is no invidious sex or race discrimination alleged in this suit, such cases are not necessarily dispositive, *Weise v. Syracuse University,* 522 F.2d 397, 404 (2d Cir. 1975), and the state involvement must be substantially greater before a private volunteer fire department can be subjected to a claim that its internal disciplinary proceedings constitute a state-sanctioned deprivation of First Amendment rights. For example, mere funding by the state of the private entity is insufficient to establish state action in such a case, *Wahba v. New York University,* 492 F.2d 96, 100 (2d Cir. 1974), cert. den., 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974), and state regulation

unrelated to the challenged activity will not suffice to establish state action. *Powe v. Miles,* 407 F.2d 73, 81 (2d Cir. 1968); *Grafton v. Brooklyn Law School,* 478 F.2d 1137, 1141–42 (2d Cir. 1973).

In *Jackson v. Statler Foundation,* 496 F.2d 623, 629 (1974) the Second Circuit Court of Appeals set forth five factors to be weighed in considering state action claims: "(1) the degree to which the 'private' organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes governmental approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves as a public function or acts as a surrogate for the State; and (5) whether the organization has legitimate claims to recognition as a 'private' organization in associational or other constitutional terms."

█ As to the first two considerations the financial input of the town which budgets for fire fighting purposes and provides facilities for the department is considerable, but there was no showing of any involvement of the town in regulation of any departmental activities. As to the third consideration, for a finding of state action to be made, there must be a showing that the state was involved in the particular activity alleged to have caused the injury. *Weise,* supra, at 405; *Lefcourt v. Legal Aid Society,* 445 F.2d 1150 (2d Cir. 1971). In *Schlein v. Milford Hospital, Inc.,* 561 F.2d 427 (1977), the Second Circuit held per curiam that a hospital's denial of staff privileges to a doctor did not amount to state action despite the state's licensing, regulation, and other involvement with the hospital. The Court, citing *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974), underscored that the existence of state action depends on "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." The Court also quoted the language of *Powe v. Miles,* su-

pra, at 81, holding that "the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury." It is the state action, not the private action, that must be the subject of the complaint. *Barrett v. United Hospital,* 376 F.Supp. 791, 803 (S.D. N.Y.) aff'd mem., 506 F.2d 1395 (2d Cir. 1974). In this case, as in *Schlein,* the state (i. e., Town) did not play any part in the formulation or implementation of the procedures utilized by the MVFD in suspending or dismissing the plaintiff and did not play any role in the making of the decision to suspend or dismiss him. In short, the Town "has not put its own weight on the side of" the procedures or standards complained of by the plaintiff. *Jackson v. Metropolitan Edison Co.,* supra, 419 U.S. at 357, 95 S.Ct. at 456. There is no nexus between the particular disciplinary activities challenged by the plaintiff and the Town's involvement with the MVFD, and thus no state action should be found.

█ With respect to the fourth consideration, plaintiff argues that the MVFD is carrying on a public function and therefore is an agency of the state despite the state's total lack of involvement in the Department's disciplinary proceedings. C.G.S. § 7–301 authorizes but does not require or oblige the Town to provide fire protection. Nevertheless, the MVFD's function of providing fire fighting and ambulance services for the Town is clearly "affected with the public interest." *Jackson v. Metropolitan Edison Co.,* supra, at 353, 95 S.Ct. 449, 455. But the public function test enumerated therein is limited in its scope. It applies to "the exercise by a private entity of powers traditionally exclusively reserved to the state." *Jackson v. Metropolitan Edison Co.,* supra, at 352, 95 S.Ct. at 454. In *Jackson* the Supreme Court found no state action in the termination of service by a private utility company, but stressed that, had the utility been exercising "some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a

different one." *Jackson,* supra, at 353, 95 S.Ct. at 454. Thus the public function test turns on the nature of the power actually exercised, and compels state action only when that power is traditionally exercised by the sovereign.

In Connecticut, there has been a long-standing tradition of exercising fire-fighting functions by voluntary organizations. Their number is considerable. In 1974, of the 371 fire departments and fire districts in Connecticut only 50 had six or more full-time firefighters, the remainder being completely or partially manned by volunteers.[2] Additionally there has been no showing that either the state or Towns have traditionally exercised the power to admit or dismiss members of private volunteer fire departments. The state and the Town in this case have never been involved in the membership or disciplinary practices of the MVFD, and the Department's own management of its internal personnel affairs does not depend on any authority granted or implied by any governmental agency. In *Lefcourt,* supra, at 1156–57, the Court noted that even if the provision of legal services to an indigent was held to be an essential state function, "the hiring and firing practices of the Society as they relate to this case do not involve the manner in which this Society carries on its public function." See also *Trivits v. Wilmington Institute,* 417 F.Supp. 160 (D.Del.1976), where it was held that a private library association receiving 90% of its support from the City did not act under color of law in discharging an employee because it was not exercising a public function in *discharging* the employee. There, as here, there was an insufficient nexus between the governmental involvement and the challenged action of the private entity. The Town simply has nothing to do with the disciplinary actions of the Department.

■ The plaintiff argues that the MVFD is so physically and financially intertwined with the Town that they must be considered joint participants in their actions. See *Burton v. Wilmington Parking Authori-*

ty, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). However, *Burton* and its progeny deal with invidious racial discrimination, and, as noted above, such cases are not necessarily determinative of situations involving First Amendment and due process issues. See *Powe v. Miles,* supra, at 83; *Lefcourt,* supra, at 1155, n. 6; and *Wahba,* supra, at 100. The plaintiff relies on *Holodnak v. Avco Corp., Avco-Lycoming Div., Stratford, Conn.,* 381 F.Supp. 191 (1974), aff'd, 514 F.2d 285 (2d Cir. 1975), cert. den., 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975), an opinion where the *Burton* doctrine was applied to a First Amendment case. The Court found that since most of the defendant corporation's land, buildings, and machinery were government owned and since 80% of its production was "defense related," the defendant's discharge of an employee for his public criticism of labor management relations constituted state action. Here, the Town owns the land, buildings, and equipment used by the MVFD, the Town participates in the financial affairs of the Department, and the MVFD performs a public function for the Town. Nevertheless, there are critical distinctions between *Holodnak* and the instant case. Holodnak brought his claim pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and the traditional protections given workers by federal labor law—in addition to First Amendment considerations—were necessarily involved in the outcome of the case. Also, both the District Court and the Second Circuit noted the presence of a large government "task force" in place at the defendant's plant overseeing all operations. *Holodnak,* supra, at 381 F.Supp. at 201, 514 F.2d at 289.

But the most important distinction between *Holodnak* and the instant case is the presence of a governmental interest and involvement in the particular activities complained of. The Second Circuit found in *Holodnak* that the government "had an obvious interest in the permissibility of the challenged activity" *Holodnak,* supra, at 289, noting the federal government's consti-

---

2. 1974 Survey conducted by the Connecticut State Labor Department.

tutional duty to provide for national defense. In effect the government was exercising its war power through the agency of a nominally private party. Given the direct governmental involvement in the defendant's financial and personnel practices and the exercise by the defendant of a power "traditionally reserved to the government itself," *Holodnak,* supra, at 292, n. 7, a finding of state action was appropriate. In the instant case, by contrast, there has been no involvement of Town employees in the activities of the MVFD. The Town has no substantial interest in the internal disciplinary activities of the Department. Such membership activities do not generate a profit for the Town, nor are they capable of affecting a constitutional governmental interest of the Town comparable in magnitude to the federal government's interest in national defense. The MVFD is a purely volunteer organization, and in exercising its authority over its own membership practices, the Department has not exercised a power traditionally reserved to the government itself. The Town's interest and involvement in the particular activities complained of (i. e., the plaintiff's disciplinary proceedings) is not overriding and direct so as to place the MVFD in the same category as the defendant in *Holodnak.*

There are also certain policy considerations which suggest to this Court that a finding of state action in this case would be unfortunate. In making a finding of state action, a court in effect announces that the federal judicial system stands ready to become involved in the activities complained of in order to vindicate constitutional or federal wrongs. To so decide, a court must first conclude that, balancing the nature of the claimed deprivation against the nature of the private activity, judicial intervention in the otherwise private activity is warranted. In balancing competing societal values in the context of First Amendment state action cases, courts have looked to two factors before deciding that a finding of state action is appropriate: whether professional judgments ordinarily beyond judicial competence are involved, and whether the imposition of federal protections may be harmful to the very existence of activities from which society benefits. Courts, for example, have declined to interfere with school grading policies where students claimed failing grades were punishment for protected speech, *Grafton,* supra. And where a First Amendment violation concerning publication of scientific research was claimed, they have avoided "judicial meddling in an area where courts should fear to tread." *Weise,* supra, at 406. Certainly this Court feels unqualified to usurp the judgment of the Chief and Executive Committee in gauging the subtle relationships among volunteer firemen and weighing how those relationships may affect the response of those volunteers to emergency situations involving risk to life and property. Where the response and efficacy of action is as dependent on personal relationships and maintenance of esprit de corps as is the case in fire-fighting activities, it would be both unrealistic and inadvisable for this Court to become involved in setting the standards for morale and disciplinary proceedings in the MVFD by ruling on whether the Chief and the Executive Committee were wrong when they exercised their professional judgment as experienced volunteer firemen and concluded that the plaintiff's conduct was detrimental to the welfare of their Department and to the essential relationship among their members known as morale.

But even more important, and in connection with the fifth consideration of *Jackson v. Statler Foundation,* supra, this Court must consider whether the imposition of federal protections flowing from a finding of state action would actually hobble the efficiency and threaten the very existence of the volunteer organization from which the Town and its population benefit. A community which has a private volunteer fire department benefits both because its citizens save tax dollars and because they assist one another directly in emergencies without the intervention of bureaucrats or paid professionals. The social fabric is thus knit more closely, and it would be unseemly for the federal courts to step in and dictate

how such a small grass roots organization should be run. The opportunity for public service and social fraternity which private volunteer fire departments provide for citizens in rural and semi-rural communities must be preserved if possible. Should state action be found here, the discouragement to participating in organizations such as the MVFD would become substantial. The MVFD has no employees. Its members have regular fulltime jobs, and perform their Department tasks whenever their occupations and spare time permit. They receive token payment for responses to fire and ambulance calls, but receive nothing for participating in the various administrative tasks of their organization (including disciplinary proceedings). To find state action here and to then require the volunteers of the MVFD to formulate precisely drawn disciplinary rules covering all situations, to analyze *Pickering v. Board of Education* criteria, to comprehend the vagaries of due process, or to hire legal assistance whenever disciplinary action is taken and to then face a federal lawsuit (over issues for which the courts themselves cannot draw clear and concise guidelines), would place an intolerable burden on the resources of the MVFD and its individual members. To require the MVFD to observe such procedures and guarantees would upset the delicate social balance, and threaten the very existence of an organization whose activities clearly benefit society. In view of the nature of the deprivation involved here (i. e., the loss of membership in a purely voluntary organization), this Court concludes that a full consideration of the societal values involved further requires a finding that there is no state action.

## III

### FIRST AMENDMENT CLAIMS

 Even were state action found in this case, the facts quickly dispose of the plaintiff's claim that his First Amendment rights have been violated. The Supreme Court has held that whether the speech of a governmental employee is constitutionally protected necessarily entails striking "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). More recently, the Supreme Court held in *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 284–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1976), that where there exist reasons independent of any First Amendment rights to dismiss a governmental employee, the fact that the constitutionally protected conduct played a substantial part in the actual decision to dismiss the employee does not amount to a constitutional violation necessitating any remedial action. Here the plaintiff's claimed protected conduct (i. e., his conducting interviews with a newspaper reporter) was not the primary or even substantial reason for his dismissal. See *Wagle v. Murray,* 560 F.2d 401, 402–03 (9th Cir. 1978), cert. denied, 434 U.S. 1014, 98 S.Ct. 729, 54 L.Ed.2d 758. Chief St. John decided to dismiss the plaintiff prior to the appearance of the newspaper article for a pattern of disruptive behavior climaxed by his sending the October 24, 1977, Cover-up letter to the Town's First Selectman. The newspaper article did not come to the Chief's attention until November 5, 1977, the day it was published. The fact the plaintiff had made unauthorized statements concerning the internal operation of the Department to a newspaper reporter simply added to the already established pattern of conduct for which he had been suspended in August and for which the Chief ultimately decided to dismiss him. Since the plaintiff's comments to the reporter were not the precipitating cause of his dismissal, there was no violation of his First Amendment rights.

## IV

### DUE PROCESS CLAIMS

 The plaintiff also claims that his dismissal from the MVFD deprived him of a property interest without due process of

law. " 'Due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). See also *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1975), where the private interest to be affected by the official action is cited as one of the factors to focus on when considering the specific dictates of due process required by any particular situation. This plaintiff's membership in a purely voluntary fire department does not rise to the level of a property interest and, under the circumstances, the due process actually afforded the plaintiff was more than adequate.

As its name indicates, the MVFD is a purely volunteer organization. It has no employees, and all members have some regular job or income upon which they rely to support themselves and their families (the plaintiff himself has a full-time job at Uniroyal, Inc.). The members receive minimal reimbursement for travel expenses to and from fires, and certainly gain no profit or monetary advantage from their membership. Connecticut law provides no statutory entitlement for a claim to membership in a volunteer fire department. The Department's By-Laws do entitle members to appeal any disciplinary action taken against them to the Executive Committee, but such an internal practice of a non-governmental organization, unsupported by any state or municipal law, does not provide a foundation for invoking the constitutional protection of due process.

 Notwithstanding the lack of any substantial property interest at stake, the process actually afforded the plaintiff by the MVFD falls well within the boundaries of fair play and substantial justice. When determining just what due process rights are appropriate in any given context, it is necessary to look to both the weight of the interest to be deprived and the practical requirements of the situation. Here, the deprivation was of membership in a volunteer organization which offered its members an opportunity to perform a public service. The practical reality of the situation was that the Department lacks the continuity and legal resources enjoyed by full-time governmental or private organizations in that its very existence depends entirely on the willingness of individuals to voluntarily sacrifice their time to attend fire calls, drills, committee meetings, and so on.

Despite these practical limitations, the plaintiff was given the following process in his dismissal: he was confronted by the Chief, given a written notice of the specific reasons for his dismissal, given an appeal hearing before the Executive Committee, given adequate notice of that hearing, given the opportunity to be represented by counsel, given the opportunity to testify on his own behalf, and given the opportunity to present witnesses on his behalf. His request to cross-examine the Chief was denied, and his request that the Chairman of the Executive Committee disqualify himself as biased was denied. The Department's By-Laws (§ 5, p. 7) empower the Executive Committee to call witnesses, but give no right of cross-examination, and where the source of the plaintiff's membership (i. e., the By-Laws) also sets forth limitations on the procedures employed in determining withdrawal of membership, the plaintiff "must take the bitter with the sweet." *Arnett v. Kennedy,* 416 U.S. 134, 153–54, 94 S.Ct. 1633, 1644, 40 L.Ed.2d 15 (1974). The plaintiff's claim of bias was based on a remark made more than one year before the hearing. The four other members of the Executive Committee discussed the bias claim, and decided that neither they nor the Chairman were in any way prevented from making a fair and impartial decision. The decision of the Committee upholding the Chief's action was unanimous (the By-Laws state "a simple majority shall rule." By-Laws § 4). Practically speaking, it would have been impossible to provide the plaintiff with an appeal board unfamiliar with

302

at least some of the circumstances underlying his dismissal, and in any case that was not legally required. *Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. 482, 491–93, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976).

Given this Court's finding that the action of the MVFD in suspending and dismissing the plaintiff did not violate any of his First and Fourteenth Amendment constitutional rights, it is not necessary to consider the plaintiff's Motion To Strike the Affirmative Defense of the Defendants, concerning which decision was reserved.

The plaintiff's prayer for injunctive relief and punitive damages is accordingly denied, and the complaint .dismissed.

SO ORDERED.