**Betty Jean BROWN, Plaintiff,**

v.

**WALT DISNEY WORLD CO., a foreign corporation, Defendant.**

**No. 90–167–CIV–ORL–18.**

United States District Court, M.D. Florida, Orlando Division.

Sept. 30, 1992.

On Motion to Amend Nov. 3, 1992.

1556

Patricia L. Strowbridge, Patricia L. Strowbridge, P.A., Orlando, Fla., for plaintiff.

Susan K. McKenna, Garwood & McKenna, P.A., Orlando, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

BAKER, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiff Betty Jean Brown ("Brown"), a black female, filed a three count complaint against her former employer, Walt Disney World Co. ("Disney"), alleging claims of employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Florida Human Rights Act, Florida Statutes § 760.01 *et seq.*, and a claim of intentional infliction of emotional distress. The claim for intentional infliction of emotional distress was disposed of on an unopposed motion for summary judgment. Pursuant to 28 U.S.C. § 636(c), the parties consented to trial before the Magistrate Judge. The case was tried June 30, July 1, July 2, July 6, and July 10, 1992.

### II. FACTUAL BACKGROUND

The exhibits and testimony establish the following facts essentially without dispute. Brown began her association with Disney when she applied for work styling wigs in September 1977. Disney hired Brown the following month as a Casual Temporary Cosmetology Specialist, a temporary position. She was assigned to the Wig Room at the Magic Kingdom where she was responsible for preparing wigs for use in various Disney shows and productions.

Brown was offered, and accepted, a permanent position as a Wardrobe Hostess when the need for her temporary position ended in January 1978. The responsibilities of this position included making quality control inspections of costumes and sorting, distribution, and keeping inventory of costumes. With this new position Brown received a new rate of pay, a rate significantly less than the rate she received as a cosmetology specialist. While Brown's official employee status remained wardrobe hostess, she performed the duties of a cosmetology specialist, but received the lower pay of a wardrobe hostess. In May 1978, her status was changed to cosmetology specialist. She received back pay and her seniority date was adjusted.

Brown remained employed as a cosmetology specialist for several years. However, following her December 1984 performance review, Brown was placed on a ninety day evaluation period. Disney management concluded during that ninety day period that Brown failed to make needed improvement in her performance. Disney terminated Brown May 8, 1985.

Brown filed two charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The first was filed on December 21, 1984, just after she was placed on the ninety day evaluation period. The second was filed August 21, 1985 following Brown's termination.

Aside from these most basic facts, nothing in this case is undisputed. Each factual issue was vigorously litigated during the four and a half day trial. But despite the parade of witnesses and documentary exhibits, accurate re-creation of the events and atmosphere involving this employment relationship, or any employment relationship, is exceedingly difficult. The nuances, causal relationships and numerous personal interactions which make up the workaday world present problems for reliable fact finding. The usual problems of possible witness bias, recall, and shading of meanings are exacerbated when trying to con-

vey the complexities of events and motivations in the workplace over an extended period of time.

After careful review of the documents and testimony in evidence, and considering the credibility of the witnesses, the Court finds that the employment decisions concerning Brown made by Disney were in part motivated by race. The Court also finds, however, that Disney would have made the same ultimate employment decisions had race not been a motivating factor.

### III. TIMELINESS OF CLAIMS

Shortly before trial, Disney filed an Emergency Motion in Limine or Alternative Motion to Dismiss. In that motion Disney argued that all of the claims or allegations of discrimination in Brown's complaint, except those relating to her termination, are untimely. Disney puts these allegations into three categories: first, allegations which were not contained in either the 1984 or 1985 EEOC charges; second, allegations contained in the 1984 charge only, which were not the subject of a timely filed civil action; third, allegations that were contained in the 1985 charge, but were older than three hundred days at the time the 1985 charge was filed.

### A. Statutory Time Limits

Title VII establishes precise time limits for filing claims with the EEOC or state or local agencies. If no appropriate state or local agency to handle employment discrimination charges exists, the charge must be filed with the EEOC within one hundred eighty days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e–5(e)(1). If there is an appropriate state or local agency, as there is in this case, the charge must first be filed with that agency within the time limits established by the agency. 42 U.S.C. § 2000e–5(c). The aggrieved party may not file with the EEOC until sixty days after commencement of the state or local proceeding. *Id.* The aggrieved party must file a charge with the EEOC within three hundred days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e–

5(e)(1); *see also* The Honorable Charles R. Richey, Manual on Employment Discrimination Law and Civil Rights Actions in the Federal Courts A–16 (Commerce Clearing House 1985). A civil complaint must be filed with the court within ninety days of receipt of a right-to-sue letter from the EEOC. *Id.* at A–17.

### B. Scope of the Complaint

▮▮▮▮ The first group of allegations cited by Disney raises the issue of the proper scope of a civil complaint. The scope of a civil complaint is limited to the scope of the EEOC investigation that can be expected to grow out of the discrimination charge. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970). If the additional charges in the civil complaint arise naturally and logically from the facts presented to the EEOC, they are related to the original charge. *Vuyanich v. Republic Nat'l Bank of Dallas*, 409 F.Supp. 1083 (N.D.Tex.1976). From a practical standpoint, one of the most important considerations in applying the *Sanchez* rule is "whether the defendant had sufficient notice from the administrative charge of the alleged *kinds* and *areas* of discrimination...." *Jiron v. Sperry Rand Corp. (Sperry–Univac)*, 423 F.Supp. 155, 159 (D.Utah 1975) (emphasis added).

▮▮▮▮ Disney seeks to exclude Brown's allegations that she was discriminated against in her original job assignment as a wardrobe hostess, by denial of a promotion to cosmetology specialist, by being deprived of conditions of employment made available to white employees, and by various incidents of harassment by co-workers and superiors. Brown's two EEOC charges include allegations that she was discriminated against by being denied promotions to "Lead" given to white employees, by being denied pay raises, by being deprived of conditions of employment made available to white employees, by being put on probation, and by various incidents of harassment by co-workers and superiors.

Disney had sufficient notice from the EEOC charges of the *kinds* and *areas* of discrimination alleged. The previously uncharged allegations presented in Brown's

civil complaint closely parallel the allegations of the EEOC charges. These additional allegations arise naturally and logically from the facts presented to the EEOC. In fact, they are almost identical to the facts presented to the EEOC. Brown has not raised a new kind of discrimination in these allegations; they raise the issue of racial discrimination, the issue that Brown raised in both of her EEOC charges. Accordingly, these allegations should not be barred on the ground that Brown failed to exhaust her administrative remedies with respect to them.

Of course, some of these allegations date back to the late 1970s. Although these allegations may have cleared one procedural hurdle on their way to trial, they face one more: timeliness. In fact, most of Brown's allegations face this same hurdle. Brown makes two arguments in an attempt to clear this hurdle. First, she argues that the allegations of the 1984 Charge were absorbed into the 1985 Charge, essentially relieving her of her duty to file suit within ninety days of receiving the right-to-sue letter regarding the 1984 Charge. Second, she argues that all of the allegations in the complaint constitute a continuing violation.

### C. Untimeliness of 1984 Charge

Brown relies on *Weise v. Syracuse University*, 522 F.2d 397 (2nd Cir.1975), for her argument that filing suit upon the 1984 Charge would have created an unreasonable procedural barrier. Brown's reliance is misplaced. In *Weise*, the Plaintiff filed two charges with the state agency regarding two discriminatory acts. These acts occurred in 1969 and 1970. The two charges were dismissed by the state agency on April 21, 1972. Plaintiff then filed a charge with the EEOC on May 8, 1972 regarding the 1969 and 1970 acts. Plaintiff filed a second EEOC charge on June 25, 1973 regarding a discriminatory act which occurred in 1973.

The court found the first EEOC charge to be untimely, but found the second EEOC charge to be timely filed. The court's discussion of a "needless procedural barrier" related to the Plaintiff's failure to file her 1973 charge with the state agency prior to filing it with the EEOC, as required by 42 U.S.C. § 2000e–5(c). The *Weise* court held that the initial reference of her case to the state forum was sufficient because:

> To force an employee to return to the state agency every time she claims a new instance of discrimination in order to have the EEOC and the courts consider the subsequent incidents along with the original ones would erect a needless procedural barrier.

*Id.* at 412 (citing *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir.1973)).

*Weise* does not stand for the proposition that a Title VII plaintiff can unilaterally choose to ignore an EEOC right-to-sue letter and the ninety day limitation upon filing suit because other, similar charges are pending before the EEOC. In fact, the law seems to be just the opposite in such situations. *See Ivy v. Meridian Coca–Cola Bottling Co.*, 108 F.R.D. 118, 126 (S.D.Miss.1985) (granting summary judgment on Plaintiff's discriminatory discharge claim where Plaintiff failed to file suit within ninety days of receipt of right-to-sue letter in the mistaken belief that he had to wait until all three of his pending claims were resolved by the EEOC).

The ninety day period in which a plaintiff must file suit is not jurisdictional, but is in the nature of a statute of limitations that is subject to waiver, estoppel and equitable tolling. *Salamat v. Village Inn Pancake Houses, Inc.*, 757 F.Supp. 1318, 1320 (W.D.Okla.1991) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)). Equitable tolling may be appropriate when a plaintiff has been lulled into action by the employer, state or federal agencies, or the courts. *Id.* In the case at bar, Brown was not lulled into action or inaction by anyone but herself and her own assumption that the 1984 Charge was absorbed into the 1985 Charge. The record does not contain any indication that the EEOC, Disney, or anyone else led Brown to believe this to be true.

Absent equitable tolling, Brown should have filed suit within ninety days of May

27, 1986. She did not. Accordingly, her claims based on the 1984 Charge are untimely. Only the continuing violation doctrine can revive these claims.

### D. Untimely Claims Within 1985 Charge

Disney argues that a number of the discriminatory acts alleged in the 1985 Charge occurred more than three hundred days before the charge was filed. Disney has provided the deposition testimony of Brown, Beryl Maley and Liz Spang in support of its argument. Brown does not dispute this testimony. Instead, she argues that she cannot pinpoint all of the relevant dates. She also argues that all of the claims should be allowed at trial because they are part of a continuing violation. Since the purpose of the continuing violation doctrine is to revive time-barred claims, Brown appears to concede the point that the allegations noted by Disney are time-barred. Thus, Brown must establish a continuing violation to proceed with these time-barred claims.

### E. Continuing Violation Doctrine

■ The continuing violation doctrine revives otherwise time-barred claims. *Roberts v. Gadsden Memorial Hosp.*, 835 F.2d 793, 800, *modified*, 850 F.2d 1549 (11th Cir.1988). To revive a time-barred claim under this doctrine, the claim must be part of a pattern or continuing practice out of which the timely filed incident arose. *Id.* Further, there must be a *violation* within the limitations period. *Malhorta v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir.1989); *Stewart v. CPC International, Inc.*, 679 F.2d 117, 121 (7th Cir.1982). If such a violation exists, a plaintiff may recover damages based on discriminatory acts occurring before the limitations period if she can establish a substantial nexus between the violation within the limitations period and the older, time-barred acts. *Roberts,* 835 F.2d at 800; *Estate of Pitre v. Western Elec. Co., Inc.*, 975 F.2d 700 (10th Cir.1992).

■ Brown's termination claim is her only claim which is timely and properly before this Court. To use the continuing violation doctrine to revive her other claims, Brown must prove that her termination violated Title VII. As discussed in Section IV, *infra,* Disney's termination did not violate Title VII. Accordingly, the continuing violation doctrine is not applicable and all of Brown's claims (other than her termination claim) are time-barred.

### F. Time-barred Claims as Relevant Background Evidence

■ Brown's termination claim is her only timely discrimination claim. Her claims of denied promotion, denied educational opportunities, denied pay raises, etc., are all time-barred and cannot be prosecuted. However, her *allegations* of denied promotion, denied educational opportunities, denied pay raises, etc., may be presented as evidence in her termination claim.

The Supreme Court has held that an untimely charge of discrimination "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue...." *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977).

In *Allen v. County of Montgomery,* 788 F.2d 1485 (11th Cir.1986), the Eleventh Circuit held that the district court committed reversible error by excluding evidence of alleged discriminatory acts which occurred prior to the discrimination at issue. The Court stated:

> While some or most of this evidence of discriminatory treatment may concern time-barred conduct, it is relevant and may be used to illuminate current practices which, viewed in isolation, may not indicate discriminatory motives. Under the facts of this case, the exclusion of this relevant evidence of prior discrimination substantially affected appellant's ability to carry her burden of demonstrating discriminatory intent.

*Id.* at 1488 (footnote and citations omitted).

Accordingly, Brown may (and in fact did) present all of her allegations of discriminatory conduct in the trial of her termination claim.

## IV. ANALYSIS OF THE TERMINATION

### A. Applicable Law

Two decisions of the Supreme Court control the analysis of Title VII cases, *McDon-*

nell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). McDonnell Douglas provides the framework for analysis when a plaintiff presents a prima facie case of discrimination and is confronted with the employer's assertion of a non-discriminatory reason for an employment decision. The employee may then attempt to show the proffered reason is false or pretextual. See, e.g., Weaver v. Casa Gallardo, Inc., 922 F.2d 1515 (11th Cir.1991). The Price Waterhouse analysis applies in cases where the evidence shows a mixture of proper and improper motives. Based on the absence of a majority opinion and relying on language in Justice O'Connor's concurring opinion, some cases have treated Price Waterhouse as applicable only where the plaintiff has offered "direct" evidence of discrimination. However, there is no apparent basis for distinguishing between cases proved by circumstantial rather than direct evidence. See, e.g., Tyler v. Bethlehem Steel Corp., 958 F.2d 1176 (2d Cir.1992). Strictly speaking, motive can rarely, if ever, be proved by direct evidence. It is more reasonable to understand the Court's use of the term "direct" as creating a distinction between probative evidence of motive and the bare inference generated by the McDonnell Douglas prima facie case analysis.

■ In this case, the Court need not wade into these muddy waters because Brown used both direct and circumstantial evidence to prove that her race played a motivating part in Disney's employment decisions. Price Waterhouse analysis is proper in this case.

The Price Waterhouse plurality and concurring opinions hold that once a plaintiff establishes that an illegitimate factor played a motivating or substantial role, a defendant can "avoid liability only by proving that it would have made the same decision even if it had not allowed [the illegitimate factor] to play such a role." Price Waterhouse, 490 U.S. at 244–45, 109 S.Ct. at 1787–88 (opinion of Brennan, Marshall, Balckmun, and Stevens, JJ.); id. at 259,

109 S.Ct. at 1795 (White, J., concurring); id. at 276–77, 109 S.Ct. at 1804 (O'Connor, J., concurring). A defendant must make this showing by a preponderance of the evidence. Id. at 253, 109 S.Ct. at 1792 (opinion of Brennan, Marshall, Blackmun, and Stevens, JJ.); id. at 260, 109 S.Ct. at 1795 (White, J., concurring); id. at 279, 109 S.Ct. at 1805 (O'Connor, J., concurring).

### B. Race as Motivating Factor

■ Disney's Wig Room was an unpleasant place to work. No one was immune to the rampant gossip and backbiting in the Wig Room. No one could avoid Wig Room politics and the factionalism nurtured by Wig Room management. Disney argues that Brown's problems in the Wig Room stemmed from the nature of the Wig Room and its generally hostile environment and were not the result of racial animus. Disney seeks to take comfort in the fact that several Wig Room employees (including non-blacks) were treated poorly or unfairly.

But the mistreatment of Betty Brown went beyond the pettiness of gossip and workplace politics. From the beginning of her employment, Brown was mistreated in ways in which other employees were not and the evidence shows that Brown's race was a motivating factor in that mistreatment and in the decisions which led to her termination.

The racially motivated mistreatment began when Disney hired Cynthia Strickland, a white woman, as a permanent cosmetology specialist in December 1977. At the time, Brown was a temporary employee, had over a year's experience in cosmetology, had been working in the Wig Room for two months, and had discussed the possibility of obtaining a permanent position there with her supervisor Mary Barnett. Strickland had worked for Disney previously from 1973 to 1976, but not as a cosmetology specialist. At the time Disney hired Strickland, she had only one month of cosmetology experience. Barnett testified that she does not know why Strickland was chosen to fill the permanent position.

Another problem with Disney's handling of Brown's employment occurred when Dis-

ney's need for Brown's temporary position ended in January of 1978. Disney put Brown in a permanent position as a wardrobe hostess. While listed as a wardrobe hostess, and while receiving the pay of a wardrobe hostess, Brown performed the duties of a cosmetology specialist. Brown's uncontradicted testimony was that she would occasionally work as a cosmetology specialist when she first stepped into the wardrobe hostess position. After a while, she began working in the Wig Room with the duties of a cosmetology specialist on a full-time basis.

Despite working full-time as a cosmetology specialist, Disney compensated Brown as a wardrobe hostess. This pay discrepancy was brought to the attention of Disney Labor Relations. There is some controversy regarding who first raised the pay discrepancy issue. Ms. Suzannah Elrod, a Disney Manager, testified that Brown contacted Labor Relations about the problem. Brown testified that she received an unsolicited call about the problem from Labor Relations. In any event, Disney perceived some improper handling of Brown's employment and took steps to correct it. Brown received a check for back pay, was officially given the status of a cosmetology specialist, and had her seniority date adjusted, but Disney did a poor job explaining the circumstances of the incident to Brown.

Further evidence in support of a finding of racial animus is the failure of Disney to promote Brown to the position of "Lead," officially titled as Cosmetology Specialist Senior. Mary Barnett testified that Brown was not promoted to Lead because she was not qualified to be a Lead. According to Barnett, Brown needed to improve her job skills, consistency, attitude and attendance before she could become a Lead.

Brown's 1981 and 1982 performance reviews reflect that Brown was rated as Exceptional or Very Good in each of those four areas.[1] In 1981, she was told that she needed development in Leadership and by 1982 she had improved her Leadership rating to satisfactory.[2]

Further, Brown was put into the position of Relief Lead in 1982, a position cosmetology specialists usually occupied prior to a promotion to Lead. Barnett recalled Brown serving as a Relief Lead but could not remember any details of Brown's brief tenure. Brown testified that she did not have any problems with Barnett while performing as a Relief Lead. Her testimony that her two day stint as a Relief Lead was

---

1. The following chart is a compilation of the performance review categories pertinent to the areas of Brown's performance that Barnett stated were lacking:

SKILLS
| Job Knowledge | 1981: Satisfactory | 1982: Very Good |
|---|---|---|
| Show | 1981: Exceptional | 1982: Exceptional |
| Quality/Quantity of Work | 1981: Exceptional | 1982: Exceptional |
| Decision Making | 1981: Satisfactory | 1982: Satisfactory |

CONSISTENCY
| Quality/Quantity of Work | 1981: Exceptional | 1982: Exceptional |
|---|---|---|
| Dependability | 1981: Satisfactory | 1982: Very Good |

ATTITUDE
| Attitude | 1981: Very Good | 1982: Very Good |
|---|---|---|
| Adaptability | 1981: Exceptional | 1982: Exceptional |
| Human Relations | 1981: Very Good | 1982: Very Good |
| Courtesy | 1981: Very Good | 1982: Very Good |
| Public Impression | 1981: Exceptional | 1982: Exceptional |

ATTENDANCE
There is no evidence that Brown's attendance during 1981 and 1982 was any worse than that of other Wig Room employees. Her supervisor's record card does not indicate that any warnings or reprimands were given to her during 1981 or 1982.

2. Despite her favorable reviews in 1981 and 1982, Brown believed her Leadership rating in both reviews was unfair.

problem free is credible in light of the fact that Barnett could not remember any problems which arose and that no negative entries were made on Brown's Supervisor Record Card, which, over the years, became a repository for negative comments about Brown's abilities and performance.

Brown's performance reviews show that she rated exceptional or very good in the areas Barnett told her needed improvement before she could be promoted. From all indications, Brown performed ably in the position of Relief Lead. Finally, all other Wig Room employees with seniority similar to Brown were made Relief Lead and ultimately promoted to Lead.[3] Disney has not adequately explained its reasons for denying Brown the opportunity to perform as Relief Lead or for refusing to promote her to a Lead position during 1981 and 1982. Barnett's testimony on this point was vague, lacked any specific and articuable factual bases and was ultimately unconvincing.

Another peculiar incident occurred in 1983, and marked a turning point in Brown's career with Disney because, following the incident, the hostility in the Wig Room increased and Brown's performance declined. Brown was injured in a car accident and was out of work on a medical leave of absence from April to August. In May, during her leave of absence, she received a letter from Marge Robbe, Group Insurance Assistant/Disability for Disney. The letter demanded refund of over $1400 paid to Brown in disability benefits because Disney's "records indicate[d] [she was] gainfully employed at Velma Beauty Salon during the time [she was] receiving disability from [Disney]." In fact, Brown had not worked at that shop following the accident,

although she had worked there part-time prior to the accident and her medical leave of absence.

Brown reported this incident to Labor Relations, but no one ever discovered who made the false report to the insurance department. Brown attempted to discover the identity of the person herself, but the more she looked into the incident, the more the hostility between Brown and Wig Room supervisors and employees grew.[4]

The racial component of that hostility, which had been simmering undetected by Brown, boiled over in September of 1984. Beryl Maley, Toni Wetmore, and Darlene Conley were in the Wig Room with Liz Spang, who was in a lead position supervising Brown at the time. Spang found a pair of panty hose on the floor, assumed they belonged to Brown, and stated that she was "tired of picking up after that god damned mother fucking nigger."[5] Brown was not in the room at the time, but she was just outside the door and did hear Spang's remark. Brown was driven to tears by the comment. The next day she told Barnett about the incident, but Barnett did nothing in response until sometime later when Rich Baker, her supervisor, brought it to her attention.

Spang often spoke of Brown as a "nigger," but not in Brown's presence. This one time that Brown heard Spang's insult, she immediately brought it to the attention of Barnett, who did nothing. Disney's investigation of the incident stalled because Maley denied hearing any racial comment and Wetmore didn't recall the specific words used. Disney never asked Conley what she heard that day, even though she had been present when Spang made the comment. As a result, no action was tak-

---

3. Cynthia Strickland was hired December 26, 1977, became a relief lead in May, 1982, and was promoted to lead in January, 1983. Darlene Conley was hired May 24, 1977 and promoted to lead in April, 1983. Liz Spang was hired April 7, 1981, became a relief lead in December, 1981 and was promoted to lead in January, 1983. Beryl Maley was hired November 17, 1981, became a relief lead in October, 1983 and was promoted to lead in September, 1984. Wilma Terry was hired in 1978 and became a lead in 1986.

4. The mystery concerning this incident continued at the trial. Barnett denied knowing who made the false report, but her denial of knowledge was hesitant and delayed.

5. The court finds the testimony of Brown and Darlene Conley on this issue credible and the testimony of Liz Spang, in which she denied making the comment, not credible.

en, except that Barnett warned Spang that similar comments in the future would result in stronger disciplinary measures, although no disciplinary measures were taken at that time.

■ Spang was not alone in her racial animosity. Barnett herself exhibited some racial animus toward Brown. Conley testified that Barnett once stated "I hate niggers."[6] On cross-examination, Conley admitted that Barnett was especially aggravated with Brown on that particular occasion, however, Barnett's aggravation with Brown does not explain or justify the broad scope or racial nature of Barnett's statement.

To summarize, the following facts support a finding that various Disney employment decisions concerning Brown, including her termination, were, in part, motivated by race: Disney hiring as a permanent employee, a white woman, Cynthia Strickland, with one month's experience in cosmetology instead of Brown, who had more than one year's experience in cosmetology and two months experience as a cosmetology specialist in the Wig Room; Disney paying Brown the low wardrobe hostess hourly rate while she was performing the duties of a cosmetology specialist; Disney failing to promote Brown to Lead and failing to adequately explain the failure to promote where Brown had been rated as "exceptional" or "very good" in the categories identified by Disney as important considerations in promotion decisions; Disney failing to adequately explain why Brown was removed as a Relief Lead after only two days in the position and failing to explain why she was never given another opportunity in the position, despite the fact that no one made any negative comments about her performance as a Relief Lead; Disney failing to investigate thoroughly Brown's allegations of mistreatment, including the disability insurance incident and Spang's racially insulting language; and, supervisors and leads using racial epithets when referring to Brown.

### C. Disney's Decision Absent Racial Motivations

■ Brown's race was impermissibly thrown into the mix of factors which Disney considered when it made employment decisions concerning Brown. However, Disney proved that it would have terminated Brown because of her performance problems, even if her race had not been considered.

Brown's performance reviews provide the clearest evidence of her performance problems. A comparison of her 1982, 1983, and 1984 performance reviews shows that Brown's performance dropped from generally exceptional and very good in 1982 to generally satisfactory and needs development in 1983 and to generally needs development in 1984.[7]

Barnett, Spang, Maley, and Wetmore testified about Brown's performance problems. Each of these witnesses testified that Brown could not consistently reproduce wig styles as needed. They also testified that Brown often took extended breaks and would "disappear" from the Wig Room without authorization or explanation. These witnesses also testified that Brown didn't take direction from leads well and that she had a bad attitude which effected the morale of the other Wig Room employees.

Plaintiff's Exhibit 20 contains 110 pages of negative notes about Brown and her work performance. Many of the notes are unsigned, but those that are signed were written by Brown's leads or supervisors. And, although many of the notes are not dated, those that are show that they were written in 1984 and 1985. Some of the

**6.** This statement and Spang's statement are direct evidence of discriminatory intent. *See Caban–Wheeler v. Elsea*, 904 F.2d 1549 (11th Cir. 1990); *Tyler*, 958 F.2d at 1184.

**7.** Brown's 1982 review rated her Exceptional in four categories, Very Good in eleven categories, Satisfactory in seven categories with no categories needing development. Her 1983 review rated her Exceptional in no categories, Very Good in only one category, Satisfactory in fourteen categories, and Needs Development in ten categories. Her 1984 review rated Brown Exceptional in no categories, Very Good in two categories, Satisfactory in six categories, and Needs Development in seventeen categories.

notes discuss petty or trivial matters, some appear to be nothing more than telephone messages taken when Brown called in sick, while others discuss substantive problems with wigs that Brown had worked on. Still other notes discuss Brown's tardiness and attendance problems and others discuss "attitude" problems such as talking back to leads or not answering questions to the full satisfaction of leads.

The sheer volume of negative comments about Brown could lead one to believe that she was a horrible employee. But the substance of the notes indicates that her leads and supervisors were filing these notes for any reason at all in an effort to document Brown as a poor employee. They almost proved too much. So many of the notes relate to trivial matters, those which do relate to substantive performance problems tend to become lost in the crowd. But make no mistake, there are notes which indicate that Brown did have some substantial problems performing her duties. The fact of prior racial animus and the self-conscious (even self-serving) nature of the notes and evaluations cast doubt on the bona fides and reliability of the criticism of Brown. On balance, however, the Court finds that substantial performance problems did exist. This conclusion is supported by testimony from other Wig Room employees, not personally implicated in racial bias. Those employees corroborated the existence of increasing performance and attendance deficiencies on the part of Brown in the latter stages of her employment at Disney.

Brown had attendance and tardiness problems. However, Disney's record keeping in this area was so confused and inconsistent, it is difficult to determine whether Brown's problems were egregious or whether they were average for the Wig Room. Brown also missed 232 days of work between April, 1983 and April, 1985 on three medical leaves of absence. Suzannah Elrod testified that medical leaves are not considered absences for disciplinary purposes, but are taken into account when an employee's overall dependability is being considered.

Determining the hypothetical question of whether Disney would have terminated Brown in the absence of racial animus is complicated by the virtual absence of other comparable employees who were terminated and by the layers of management involved in the evaluation and termination process. Because no other cosmetology specialists were actually fired (after their initial probationary periods), it is impossible to state with certainty what standard was being used in deciding to terminate employees. It is also difficult to divine how that management decision would have been made if Brown's employee records had not been infected with comments impermissibly tainted by racial animus.

Viewed objectively and in light of a reasonable standard for acceptable employee conduct, Disney has established that Brown's actual job-related difficulties would have resulted in her termination without regard to the improper racial animus.

### V. REMEDIES

■ Under *Price Waterhouse*, Disney has avoided liability by proving that it would have terminated Brown even if it had not taken her race into account. This aspect of the *Price Waterhouse* holding was overturned by the Civil Rights Acts of 1991 ("The Act"). Under 42 U.S.C. § 2000e–2(m) and 42 U.S.C. § 2000e–5(g)(2)(B), when a plaintiff proves race played a motivating factor in an employment decision and an employer proves it would have made the same decision absent race, the court:

(i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) of this title; and,

(ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

42 U.S.C. § 2000e–5(g)(2)(B).

■ This conflict between *Price Waterhouse* and the Act presents the issue of the

retroactivity of § 2000e–5(g)(2)(B). This Court has ruled previously in this case that the Act should have prospective application only. That Order denied Brown's request to add claims for compensatory and punitive damages and her demand for a jury trial, provisions made available by the Act. Although retroactive application of § 2000e–5(g)(2)(B) presents slightly different issues than retroactivity of the damages and jury trial portions of the Act, this Court will follow its prior decision and will not apply § 2000e–5(g)(2)(B) retroactively. This result is supported by the uniform rejection of any retroactivity for the Act by the courts of appeals which have considered the question. *Vogel v. City of Cincinnati,* 959 F.2d 594 (6th Cir.1992); *Fray v. Omaha World Herald Co.,* 960 F.2d 1370 (8th Cir.1992); *Mozee v. American Commercial Marine Serv. Co.,* 963 F.2d 929 (7th Cir.1992); *Johnson v. Uncle Ben's, Inc.,* 965 F.2d 1363 (5th Cir.1992). Additionally, the Eleventh Circuit's decision in *United States v. Peppertree Apartments,* 942 F.2d 1555 (11th Cir.1991) has been vacated. That decision was the primary basis for most of the earlier district court opinions in this circuit which favored retroactivity of the Act.

## VI. ATTORNEY'S FEES

■ The parties have raised the issue of attorney's fees in their Pre–Trial Stipulation. Specifically, Disney seeks an award of attorney's fees and costs as a prevailing defendant under 42 U.S.C. § 2000e–5(k). Disney has prevailed upon Brown's claims, but is not entitled to an award of attorney's fees.

In *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), the Supreme Court set forth the standard for recovery of attorney's fees by a prevailing defendant in Title VII cases. The Court held that "a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Id.* at 421, 98 S.Ct. at 700.

Brown's action was not frivolous, unreasonable or without foundation. As discussed in Section IV, Disney impermissibly considered Brown's race when it terminated her. Brown was justified in prosecuting this action.

## VII. CONCLUSION

Brown's termination claim is the only claim properly before this Court. Brown's other claims are time-barred and cannot be revived by the continuing violation doctrine. Brown proved that her race did play a motivating or substantial role in her termination. However, Disney proved by a preponderance of the evidence that it would have terminated Brown even if it had not taken Brown's race into account. Accordingly, Disney has not violated Title VII. Disney is not entitled to attorney's fees or costs under Title VII.

DONE and ORDERED.

## ON MOTION TO AMEND

This cause came on for consideration without oral argument on the following motion filed herein:

> MOTION: PLAINTIFF'S MOTION TO AMEND MEMORANDUM OPINION AND ORDER INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW AND TO AMEND FINAL JUDGMENT (# 66)
>
> FILED: October 9, 1992

Plaintiff raises three grounds: (1) the "continuing violation doctrine" was misapplied to bar consideration of Plaintiff's claims of: (a) failure to promote; (b) racially hostile atmosphere; and (c) retaliatory discharge; (2) *Price Waterhouse* analysis should not be applied in this case; and (3) Defendant failed to prove Plaintiff would have been discharged in the absence of discrimination.

As to item 1, based on the other findings and conclusions set forth in the Memorandum Opinion, these claims are unavailing regardless of their survival under the continuing violation doctrine. Further, the Court finds that Plaintiff failed to prove

that, within the 300 day period, she was discriminatorily. denied promotion, subject to an impermissibly racially hostile atmosphere, or discharged in retaliation for her discrimination complaints.

As to item 2, the Eleventh Circuit has ruled that the 1991 Civil Rights Act amendments are prospective only, at least in cases which went to judgment prior to enactment. *Baynes v. AT & T Technologies, Inc.*, 976 F.2d 1370 (11th Cir.1992). Although the case at bar is in a different procedural posture (one expressly reserved by the Court of Appeals), the reasoning and result in *Baynes* strongly support continued adherence to the previous rulings that the 1991 not be applied to this case.

Plaintiff's third point is nothing more than a reargument of the evidence and inferences to be drawn therefrom.

The motion for amendment is DENIED in all respects.

DONE and ORDERED.